### BECKWITH *v.* BEAN.

A., who was an officer of the army, and acting as a provost-marshal in Vermont, arrested B., during the rebellion, on the charge of aiding and abetting deserters from the army. At the time of making the arrest, A. had no warrant, but was acting under orders of his commanding officer, based upon a report made to him by A. B. having brought an action for false imprisonment against A., the latter, for the purpose of satisfying the jury of the misconduct of B., and in support of his own testimony as to the state of facts which he at the time of making the arrest believed in good faith to exist, offered to show, by evidence which was not known to him at the time of B.'s release from imprisonment, that the latter had, during the rebellion, been engaged in procuring men to enlist in the army, and to desert after they had obtained their bounty; but the court, on the ground that the offered evidence did not become known to A. until after the commencement of the suit, excluded it. *Held,* that the evidence was admissible in mitigation of damages.

ERROR to the Circuit Court of the United States for the District of Vermont.

The case was argued by *The Attorney-General* and *The Solicitor-General* for the plaintiffs in error, and by *Mr. E. J. Phelps* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is an action by Andrew J. Bean against Beckwith and Henry, plaintiffs in error, for assault and battery and false imprisonment. It was commenced in the year 1865, in the

County Court of Orange County, Vermont, and was thence removed for trial into the Circuit Court of the United States for that district. The defendants pleaded not guilty, and also filed several special pleas. At a former term, the case was brought to this court upon a certificate of division in opinion between the circuit and the district judge as to the sufficiency of some of those special pleas. We adjudged them to be defective. 18 Wall. 515. Upon a return of the case to the court below, a trial under the plea of not guilty resulted in a verdict in Bean's favor for $15,000. Judgment having been rendered thereon against the defendants, this writ of error is prosecuted.

Before entering upon the discussion of the legal propositions presented for our determination, it is necessary to state the leading facts out of which this litigation arose, and which the evidence before the jury tended to establish.

Bean, the defendant in error, was, in June, 1864, a resident of Coaticoke, in the Dominion of Canada. His ordinary business was that of a harness-maker, but during the period hereinafter referred to he was, to some extent, engaged in the business of substitute brokerage, or in furnishing substitutes for our army. Henry and Beckwith, plaintiffs in error, were officers of the Union army, the former being provost-marshal and the latter assistant provost-marshal of the second congressional district of Vermont. They were appointed, commissioned, and sworn, as required by the statute popularly known as the Conscription Act of Congress, and were subordinates of General Pitcher, who was acting assistant provost-marshal-general for Vermont until October, 1864, when he was succeeded by Major William Austine. All of said officers and subordinates were subject to the authority of Major-General Dix, commanding, by appointment of President Lincoln, the department of the East, which embraced the State of Vermont.

On the 14th of June, 1864, Bean, accompanied by one Jewell and one Buckland, came from Canada to the headquarters of Captains Henry and Beckwith at Woodstock, Vt. They were accompanied by Eldon Brown and John Guptil. Before leaving Canada, Bean had a contract with Brown that the latter should come to the United States and enlist in our army as a substitute for persons drafted under the Conscription Act. In that

contract Buckland had an interest, by stipulation with Bean. While at Woodstock, these five persons occupied the same room. Bean, Buckland, and Jewell proposed to, or through, one J. C. Stevens to enlist Brown and Guptil as substitutes; and thereupon an agreement was made, whereby Stevens was to pay Bean and his associates $600 for Brown and Guptil each, the proposed substitutes to receive out of that sum $200 each. Brown and Guptil, upon examination, were accepted and clothed in the uniform of soldiers, receiving $200 each from Stevens, while Bean, Jewell, and Buckland received $800 between them, and returned the same day to Canada. For the purpose, doubtless, of guarding against immediate desertion, Brown and Guptil were required by the provost-marshal to deposit their bounty with a clerk in the office, as security for their departure, on the following evening, to the recruiting rendezvous at New Haven, Conn. During the next day, each obtained five dollars of their bounty-money, and the same day deserted. On the 23d of June, 1864, all the facts and circumstances connected with the enlistment and desertion of Brown and Guptil were verbally communicated by Captain Henry in person to General Pitcher, who directed that transportation to the northern border of Vermont be furnished to Captain Beckwith, with instructions to arrest the deserters, as well as Bean, Jewell, and Buckland, and bring them to headquarters. Transportation being furnished to Beckwith in pursuance of that order, he endeavored, under written instructions from Captain Henry, to effect the arrest of the parties; but his efforts in that direction were fruitless, until Nov. 11, 1864, when, meeting Bean upon the cars, he arrested him, using no more force than necessary. He informed him at the time that he had no warrant, but was acting under military order, and that the charge against him was that of aiding and abetting Brown and Guptil to desert. Upon the succeeding day, Bean was taken to Captain Henry's headquarters, and by his order was placed in the State prison at Windsor, — that being the usual place for confinement of persons charged with offences against military law, — and he remained there in custody until April, 1865, when he was discharged, under the circumstances hereafter detailed.

The testimony of Bean tended to show that his confinement was prolonged unnecessarily, not only under circumstances of humiliation and severity, but against his protestation of innocence and frequent demands to be tried, by the civil courts, for the offence imputed to him. It further tended to show that such confinement without trial was procured or caused by the plaintiffs in error, and that among the results of such imprisonment was the destruction of his business in Canada, the loss of property, and the expenditure of large sums of money.

Upon the part of the plaintiffs in error, the evidence tended to show that, from the circumstances and such information as they were able to obtain, they each believed, before and at the time of Bean's arrest, that the enlistment and desertion of Brown and Guptil were in pursuance of a previous plan for that purpose formed between the deserters and Bean, Jewell, and Buckland, and that Bean and his associates aided and abetted in such desertion and escape; that, on 20th November, 1864, Captain Henry embodied in his regular tri-monthly report to the provost-marshal-general at Washington a general statement of Bean's arrest upon the charge of "taking part of the money paid for two substitutes," and then "being privy to their desertion," and that he was held for the return of the $800; that, on the 8th of December, Bean wrote to Major Austine, inquiring whether report of his case had been made to him, which letter was referred to Captain Henry for "report on the case;" that, on the 13th of December, Captain Henry made such report, and had delayed a report until that date by the request of Bean; that, on December 16, Captain Henry, by direction of Major Austine, furnished Bean a written statement of the charges against him, and saying, "And it is claimed that you shall pay for the use of the government the $800, with the expense of your arrest;" that, on 20th December, he communicated to Major Austine other facts in the case; that, on 21st December, he again, by written communication, called the attention of Major Austine to the case, expressing the opinion that the evidence then in his possession was insufficient to convict Bean in the civil courts under the Enrolment Act, and suggesting that he be turned over to General Dix or the military authority, rather than to the district attorney; that, on 3d January,

1865. Major Austine was officially advised, from department headquarters, that the case of Bean and his confederates was one of gross fraud upon the government, and authorizing him to collect from them, either individually or collectively, the amount received by them ; to take all necessary steps for the arrest of the parties then at large, and keep them in custody until the money and expenses of their arrest were paid, and to discharge them when the money was paid over, — of which order Bean was advised on 6th January, 1865 ; that, on 21st January, Bean addressed, through Major Austine, a communication to General Dix, protesting his innocence, complaining of Major Austine, and demanding trial before the civil courts ; that, on 24th January, an answer came from department headquarters, reiterating the condition of Bean's discharge as set forth in the order of January 3, and directing Major Austine " to cause Bean to be distinctly informed that he was arrested by orders from these headquarters ; " that, on 24th February, Major Austine sent all his papers to department headquarters, and they were transmitted to the adjutant-general of the army at Washington, with an indorsement by General Dix, that " Bean was held by mine (his) orders for complicity in a gross fraud against the United States ; " that the papers were returned to Major Austine in April, after passing through the offices of Secretary of War, adjutant-general, judge-advocate-general, provost-marshal, and inspector-general, with directions that Bean be turned over to the civil authorities for trial ; that, upon receiving the order last mentioned, Captain Henry called the attention of the district attorney to its provisions, and invited his attention to the case; that, on 26th April, 1865, Bean was taken before a justice of the peace, who discharged him upon bond for his appearance before a United States commissioner when called upon; that, on 11th May, 1865, an examining trial was held, and Bean required to give bail for his appearance to answer any indictment before the grand jury, but that tribunal, upon investigation, failed to find an indictment against him.

It is stated in the bill of exceptions that the plaintiffs in error gave no other or further evidence, either oral or written, of any orders from the President of the United States, or their superior

officers, than those just described; that the defendants and General Pitcher were examined as witnesses, and did not claim that said orders had been issued, known to, or approved by the President.

The evidence of plaintiffs in error tended to show that, while imprisoned, Bean was treated humanely; that Beckwith, in all he did, in regard to the arrest and confinement of Bean, acted in good faith and under the command of his superior officer, Captain Henry; that the latter, in all he did, acted in good faith and in obedience to the orders of his superior officers, as hereinbefore detailed; and that from time to time he promptly communicated to Bean the orders he received from his superior officers.

During the trial, the plaintiffs in error offered in evidence the depositions of George W. Kinney and of said Jewell and Brown, to the reading of which the defendant in error objected. The objection was sustained, and plaintiffs in error excepted.

Kinney, in his deposition, details the substance of a conversation held by him with Bean after the latter's discharge. He says: "I was talking with him in regard to this matter, asking if he didn't think it rather rough to be taking those fellows over the other side to get shot, or words to that effect. He replied, he didn't calculate to have them shot; if they were smart, he should have them back in a few days." Witness says that there were a good many persons in Canada, during the war, who were generally known as deserters from the Federal army, and he understood from Bean that his dealings, to some extent, were with that class, and that some persons enlisted by him "had been out already two or three times."

The deposition of Brown shows that in July, 1863, he enlisted in the State of Maine in the Federal army, and within a short time thereafter deserted, and went to Canada; that Bean and others, who, as he thought, knew him to be a deserter, suggested that he should return to the United States and enlist; that, in consequence of the hard times, he concluded to adopt the suggestion; that, after advising with Jewell upon the subject, the latter told him to go on, and he would overtake him upon the road; that he learned at the same time from Jewell that one Isaac Thomas would be sent along with him;

that *en route* to Vermont to enlist, Buckland overtook them, and claimed him (Brown) "as his man;" that farther along in the journey Bean joined the party, and held a conversation with Jewell and Buckland apart from the witness; that there was conversation in the crowd about Thomas and himself enlisting under assumed names; that he concluded not to change his, but Thomas assumed the name of John Guptil; that it was first determined to enlist at Lebanon, and for that purpose Bean, Jewell, and Buckland went to the provost-marshal's office at that place, but failing to enlist there, they all proceeded to Woodstock, where they did enlist.

The deposition of Jewell shows that he was himself a deserter. He details the circumstances under which Bean, Buckland, and himself formed the purpose to place Brown and Guptil as substitutes in the army. It appears in his deposition that some dispute arose between Buckland and Bean about Brown. Bean insisted that Brown "belonged" to him. Their differences were compromised by an agreement "to divide the profits if they put him in." He explains why Brown and Guptil were not enlisted at Lebanon. He says, "We all went from White River Junction to Lebanon, where the provost-marshal's office was, to see what we could get for the men. Not succeeding to our satisfaction there, we concluded to go elsewhere. The reason was they were shipping their men daily direct to Concord. Brown did not want to go to the front so soon, but wanted longer time to get away, he not designing to go to the front at all; went back to White River Junction; took dinner there. We fell in with a man by the name of Stevens. This man was buying men, and said he would give so much for them there, or something more to take them to Woodstock and put them in. We concluded the best way was to take them to Woodstock. We procured a team at the junction. . . . When we came to Woodstock, Bean, Buckland, and myself went to the provost-marshal's office first, and afterwards all went there, but did not enlist the men, for the reason that the men could not get their bounty till they got to camp, and they would not enlist. We drove back to White River Junction; saw Stevens again; I think he gave them some money, can't tell how much, to go back to Wood-

stock and enlist. After they (Brown and Thomas) had received the money, they started to Woodstock the second time with Stevens. I remained at the junction. My being subject to the service, Bean and Buckland advised me to remain there, and they would do the business of enlisting the men at Woodstock. Next day they came back, and we all — Bean, Buckland, and myself — took the train for Canada. I had received nothing out of the bounty before that from Thomas. They said they would fix me all right when we got home. After we got home, I said something to them about it. They said they had nothing for me, that I was lucky to get back myself. . . . I knew from both Brown and Thomas, before we left Canada, they were deserters. It was distinctly understood by us all, including Brown and Buckland, that both Brown and Thomas were deserters, and that was the reason why we were selecting other names by which they were to be enlisted. At least that was the way I understood it, and supposed all understood it so."

Upon the conclusion of the evidence, the court overruled a motion of plaintiffs in error to dismiss the action, refused to instruct the jury as asked by them, and gave an elaborate charge upon the evidence and the law of the case.

The action of the court below in excluding the depositions of Kinney, Brown, and Jewell presents the first question for our consideration. Counsel for defendant in error contends that the facts stated in those depositions are not admissible for any purpose, not even in mitigation of damages.

There can be no rational doubt that the facts detailed by those witnesses, in connection with the evidence before the jury, conduced to show that Brown and Guptil were, at the time of their enlistment as substitutes, known to Bean, Jewell, and Buckland to be deserters from the Federal army, and that Bean, in conjunction with his associates, enlisted them in pursuance of an understanding had before leaving Canada, that they would desert as soon as they received their bounty, and that in such desertion they would receive all the aid which Bean and his associates could render. We express no opinion as to the degree of credit to which these witnesses were entitled. Nor do we say that the jury should have reached the conclusion which their evidence conduced to establish, viz.,

that Bean was, in fact, guilty of the offence for which he was arrested by Beckwith, under the written and verbal orders of his superior officers, — an offence punishable, upon conviction, by a fine not exceeding $500, and imprisonment not exceeding two years nor less than six months. 12 Stat. 735. Was the excluded evidence competent for any purpose in this case? We are of opinion that it was competent in mitigation of damages. It tended to show the state of case which plaintiffs in error testify under oath they believed in good faith existed at the time of the arrest. It conduced to show that plaintiffs in error did not act from mere personal ill-will or from corrupt motives, and were not guilty of a wanton, reckless exercise of power for the mere purpose of humiliating and oppressing one who had not become obnoxious to the laws of the land. It tended to rebut the presumption of malice which might arise from the simple arrest and imprisonment, unaccompanied by any explanation of the reasons therefor. In connection with evidence which was admitted without objection, it seems to present a case which, under the law, did not call for or admit of vindictive or punitory damages against the plaintiffs in error. In determining whether the case demanded such damages, the jury had the right to consider all the attendant facts and circumstances out of which the arrest and imprisonment arose. They could not well ignore the important fact that the arrest occurred at a period in the country's history when the intensest public anxiety for the fate of the Union pervaded all classes. The necessities of the government and the condition of the army had compelled the adoption of the most stringent and, in some respects, harassing regulations for an increase of the national forces. The enforcement of those regulations, in some localities, was made the occasion of tumultuous assemblages which threatened to disturb the peace of the country, at a time when the utmost energy and unity of action were required for the preservation of the government against armed insurrection. Citizens drafted were required to enter the military service, or furnish acceptable substitutes. The plaintiffs in error were charged with delicate and important duties in connection with the enlistment and enrolment of substitutes for that service. It is to be presumed that, independent of the

desire to discharge the obligations of their official oaths, they shared the prevailing anxiety for the safety of the government, and recognized the fact that its safety depended upon speedy additions to the army then engaged in defending it. Neither evidence nor argument is needed to prove that the efforts of the government to strengthen the national forces by draft would have been seriously retarded, and perhaps altogether thwarted, if substitute brokers could, with impunity, and for purposes of private gain, impose fraudulent enlistments upon recruiting officers, and then connive at or aid and abet the desertion of the substitutes as soon as they had received their bounty-money. Whether such considerations influenced, or to what extent they should have influenced, the course of plaintiffs in error was for the jury, when determining whether punishment by exemplary damages should be inflicted. Further, if Captain Henry in good faith believed that Bean was guilty of such misconduct in the enlistment of the two deserters, it was his duty to communicate the facts and circumstances to his superior officer. If the order to Beckwith to arrest Bean was given by him in good faith, believing it to be his duty to obey the command of his superior officer, General Pitcher; if Beckwith executed the order under a like belief, and in like good faith; if the arrest was made and the imprisonment ordered from an honest purpose to guard the public interests and protect the army from the evil consequences of sham enlistments and frequent desertions, — they were entitled, by every consideration of justice, to stand before the jury in a more favorable light upon the question of damages than they would or should have stood had they been actuated by ill-will or sought to oppress one whose conduct had not justified the conclusion that he had violated any law. Every fact, therefore, which served to illustrate the motives which governed the plaintiffs in error in committing the trespasses complained of, and every fact which fairly conduced to prove the existence or non-existence of just grounds for imputing to Bean the fraudulent and illegal acts charged against him, and which were assigned as the cause of his arrest, were competent evidence, not in justification, but in mitigation of damages. It is the settled doctrine that " damages are graduated by the intent of the party committing the wrong." Sedg-

wick, Damages, 455. It is equally well settled that in the absence of gross fraud, malice, or oppression, in cases of trespass to person or estate, the jury should restrict damages to compensation or satisfaction for the actual injuries sustained. Sedgwick, Damages, 39; *Day* v. *Woodworth et al.*, 13 How. 361. They may, when legal justification is not shown, consider the direct expenses incurred by the injured party, his loss of time, his bodily sufferings, under some circumstances his mental agony, his loss of reputation, the degree of indignity involved in the wrong done, and the consequent public disgrace attending the injury. These and similar elements of injury may be made the basis of compensation, and such compensation cannot be diminished by reason of good motives upon the part of the wrong-doer. But when the injured party seeks, as here, to show a case of "great aggravation, cruelty, and injustice," and upon that ground asks for exemplary or vindictive damages, by way of punishment, it was competent, in reduction of such vindictive damages, and for the purpose of restricting the jury to compensatory damages, to give in evidence such facts and circumstances connected with the injury complained of as might show the truth of the whole case, as it existed at the time of arrest. In *Day* v. *Woodworth* (*supra*), this court said that the question of smart-money "has always been left to the discretion of the jury, as the degree of punishment to be thus inflicted must depend upon the peculiar circumstances of each case;" that is, "upon the degree of malice, wantonness, oppression, or outrage of the defendant's conduct." Hence it has been held that, where the injury complained of was an arrest without warrant, the defendant could show, in mitigation of damages, and as explaining the arrest, that the plaintiff was justly suspected of felony. 2 Greenl. Evid., sect. 267; 3 Phillips, Evid. 518. The text in Greenleaf seems to rest partly upon the authority of *Chinn* v. *Morris*, 1 Ry. & M. 424, and *Simpson* v. *McCaffrey*, 13 Ohio, 508. The first case was trespass for an assault and false imprisonment. The defendant had given the plaintiff in charge to a constable for felony, and he was taken by the officer to a magistrate, who dismissed the charge. The defendant admitted, on the trial, that he had not sufficient evidence to sustain the charge of felony, but proposed to show that there

was reasonable ground of suspicion. Best, C. J., held the evidence admissible in reduction of damages. That case was cited, with approval, in *Linford* v. *Lake*, 3 H. & N. 276. The case in 13 Ohio was trespass for illegally entering and searching plaintiff's house, tearing up porch, ransacking house, and breaking open desk, without legal authority. Certain evidence was offered in justification as well as in mitigation of damages. The court said: " The evidence ruled out by the justice of the peace, as shown by the bill of exceptions, in no sense constituted a justification of the trespass complained of. But it was competent in mitigation of damages. The principle of permitting damages, in certain cases, to go beyond naked compensation, is for example, and the punishment of the guilty party for the wicked, corrupt, and malignant motive and design which prompted him to the wrongful act. A trespass may be committed from a mistaken notion of power, and from an honest motive to accomplish some good end. But the law tolerates no such abuse of power, nor excuses such act; yet, in morals and the eye of the law, there is a vast difference between the criminality of a person acting mistakenly from a worthy motive, and one committing the same act from a wanton and malignant spirit, and with a corrupt and wicked design. Hence, when a jury are called upon to give smart-money or damages, beyond compensation, to punish the party guilty of the wrongful act, any evidence which would show this difference, or rather all the facts and circumstances which tend to explain or disclose the motives and design of the party committing the wrongful act, are evidence which should go to the jury for their due consideration."

To the same effect is *Roth* v. *Smith*, 54 Ill. 432. That was an action to recover damages for having advised and procured, upon affidavit, the arrest and imprisonment of the plaintiff, by a Federal officer, upon the charge of discouraging enlistments. Evidence was admitted, against the objection of the plaintiff, that he had in fact discouraged enlistments; and upon appeal to the Supreme Court of Illinois that evidence was held to be competent in reduction of damages, upon the ground that it explained the circumstances of the alleged arrest, and tended to show that the defendant was not actuated by malice. That

court, speaking through Chief Justice Lawrence, said: " Admitting that on proof of these facts the plaintiff would have been entitled to a verdict for some amount, he certainly would not have been entitled to nearly as large a sum in the way of damages, if the affidavit was true, as he should have received if it had not been true. If the affidavit was not true, and if the arrest was by procurement of defendant, the jury should presume malice, and award heavy vindictive damages. If the affidavit in fact was true, and the jury could see that the defendant, in making it, even though he voluntarily furnished it to the marshal and advised the arrest of the plaintiff, was acting without malice and in the belief that the public good required the arrest of the plaintiff, and that he could be legally arrested, and that, in causing his arrest, so far as the defendant could be said to cause it, he believed himself to be in the performance of his duty as a citizen, it would clearly, in such a case, be the duty of the jury to give only compensatory and not vindictive damages."

In *McCall* v. *McDowell* (1 Deady, 233), which was an action for false imprisonment brought by McCall against General McDowell, it appeared in evidence that the plaintiff had, in gross and incendiary language, expressed exultation at the assassination of President Lincoln, for which conduct he was arrested and imprisoned under the orders of General McDowell. While this conduct did not, in the opinion of the learned judge trying the case, furnish legal justification for the arrest and imprisonment, it was competent evidence, in mitigation of damages, to go to the jury to show that the arrest was without bad motive, and with the purpose of discharging what the defendant, in the execution of high and responsible public functions, conceived, in good faith, to be his duty at a critical period in the country's history.

A case in point is *Botts* v. *Williams*, 17 B. Mon. (Ky.) 687. That was an action for trespass and false imprisonment. It appeared that the defendants, without warrant, and in violation of the laws of Kentucky regulating the apprehension and detention of fugitives from other States, arrested the plaintiff in that State and took him to Ohio, from which State it was alleged he was a fugitive from justice, having committed a felony there. The defendants, under the plea of not guilty,

offered to prove the declarations of the plaintiff that he had committed a felony in Ohio, and that a reward had been offered for his apprehension. It was held that while such declarations did not establish justification for the apprehension and transportation of the plaintiff beyond the State, they were "admissible in mitigation of damages, as conducing to show that the defendants, in making the arrest, were prompted by honest motives and no ill-will to the plaintiff."

The same general doctrine is announced in Mr. Mayne's Treatise on the Law of Damages. That author says: "Of course, in all cases where motive may be a ground of aggravation, evidence on this score will also be admissible in reduction of damages. Hence, in an action for false imprisonment, evidence may be given of a reasonable suspicion that the plaintiff had been guilty of a felony, without any attempt at setting up a justification." Says the same author: "And if the plaintiff was given in custody for an offence not justifying an arrest, evidence may be given of the offence. It is in the nature of an apology for the defendant's conduct." Mayne, Damages, pp. 74, 75.

Further citation of authority seems to be unnecessary. The rules announced in the authorities cited meet our approval, and we are not referred to any elementary treatise or adjudged case which states the law differently. It results that the court below erred in sustaining objections to the reading of the depositions of Kinney, Brown, and Jewell. The reasons assigned for their exclusion were insufficient. The court, in excluding them, said that it did so " upon the ground that the guilt or innocence of said Bean was not a question for the determination of the jury, but that all the facts and circumstances which were known to the defendants, or with which they in any way became acquainted prior to the imprisonment, could be admitted for the purpose of rebutting malice and showing that they acted in good faith ; but that they could not give in evidence circumstances of which they had never heard until after the commencement of this suit." It is true that the guilt or innocence of Bean was not for the determination of the jury, for the purpose of inflicting punishment for the offence imputed to him. But, as already shown, it was the right of the plaintiffs in error to prove, in mitigation of damages, that

they were governed, in their whole conduct, by a sense of public duty, and not by a malignant purpose to oppress and humiliate the defendant in error. It was their right to show that the truth of the case, as it actually existed at the time of arrest, sustained the belief under which they acted.

Such a right would, however, be valueless, and such proof impossible, if the jury were not allowed to inquire whether there were, in fact, just grounds to charge upon Bean the fraudulent and illegal acts which were assigned as the reason for his arrest. The existence or non-existence of such grounds might materially influence the mind of the jury in determining whether the plaintiffs in error acted from a sense of duty, or from malice and sheer wantonness. If evidence of an honest belief, upon the part of plaintiffs in error, that Bean was privy to the desertion of the substitutes was competent in mitigation of vindictive damages, proof that he was, in fact, guilty of that offence would serve to show that such belief was not recklessly or inconsiderately formed, and that " the charge was not a pure invention." *Linford* v. *Lake, supra.* The fact of Bean's complicity in the desertion of Brown and Guptil was believed, in good faith, by Henry and Beckwith to exist when the arrest and imprisonment occurred. So they testify under oath. Should they be precluded from establishing such complicity by the admission of Bean himself to the witness Kinney, simply because such admission was not made until after Bean's release from custody ? We think not. Had the admission been in writing, its competency could not well be doubted. That it was verbal is an objection, not to its admissibility, but to its value as evidence upon which to find a verdict. Verbal confessions or admissions, made in the presence of the witness alone, constitute, it is true, very unsatisfactory evidence, partly because of the facility with which they may be fabricated. It is, therefore, to be received with great caution ; but " where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature." 1 Greenl. Evid., sect. 200 ; *Botts* v. *Williams, supra ; Higgs* v. *Wilson,* 3 Met. (Ky.) 337. " The caution," says the Court of Appeals of Kentucky, " should be applied to the proof of the statement, and not to the statement when proved."

The same considerations apply to the evidence of Brown and Jewell. Most, if not all, of the substantial facts to which they deposed were known to defendants in error at and before the arrest. The excluded evidence was in support and corroboration of that which was known and believed at the time of the arrest to exist. It was cumulative evidence of the same general character as that which was admitted without objection. It introduced no new issue. That plaintiffs in error may not have been advised, until after Bean's discharge, that those facts could be established by the testimony of Brown and Jewell more fully or more clearly than other witnesses could, or in corroboration of what other witnesses would state, constituted no reason for the exclusion of that evidence. Nor is the determination of this question affected by the fact that the defendant in error, upon the trial, complained more of his long confinement in prison than of the original arrest. We should regard all the circumstances attending the imprisonment, and not merely the period during which the imprisonment was continued. *Read* v. *Sowerby*, 2 M. & S. 78; 3 Starkie, Evid. 1452, 1453. One of the issues before the jury, as shown by the charge of the court, was as to the responsibility of the plaintiffs in error for the prolongation of the imprisonment, and the denial to Bean of a speedy trial in the civil courts. While it is true that good faith in the original arrest and imprisonment might have been succeeded by bad faith in unnecessarily continuing the imprisonment, and in preventing a trial of Bean in the civil courts, which alone had cognizance of the specific offence charged, it was for the jury, upon all the legitimate evidence which either side could produce, to determine whether such was the fact. If the excluded evidence was competent upon the issue of good faith in the arrest and the original imprisonment, — and we have held that it was, — the plaintiffs in error were entitled to have it before the jury in their consideration of the whole case, since any failure or deficiency in their proof, in that respect, might have justified the jury in believing that from the very outset they were actuated by improper motives.

A less liberal rule in the admission of evidence than that indicated in this opinion would often work the grossest injustice in cases where, as here, vindictive damages are sought

against mere subordinates, whose testimony, if credited by the jury, would show that they acted in good faith, from a sense of public duty, and in obedience to the orders of their superior officers, who promptly assumed, and upon whom justly rested, the responsibility, not only for the prolongation of the imprisonment complained of, but for the denial of a speedy trial in the civil courts.

Upon this branch of this case it is proper to make one further remark. When the depositions of Kinney, Brown, and Jewell were offered, the objection was that, in their substance, they were not competent evidence, but that if any part of either of them was admissible, " it was so intermingled with inadmissible statements that the whole became inadmissible." The objection was made at the moment they were offered, without calling the attention of the court to the particular portions of the depositions which were claimed to be inadmissible under any view of the case. They were not excluded upon any such ground. They were excluded upon the broad ground that the facts and circumstances detailed by those witnesses were not heard of by the plaintiffs in error until after the commencement of this action. In this condition of the record it would be improper for this court, in view of what has been said, to sustain the ruling of the court below, simply because, in those depositions, there may be, here and there, isolated statements not affecting the substance of what the witnesses testified, and which, upon specific objections, could have been excluded as incompetent under the general rules governing the admission of testimony.

Upon the conclusion of the evidence before the jury, the plaintiffs in error moved, in writing, that the case be dismissed, upon the ground that " all the facts proved establish that the acts done by them, for which the plaintiff claims to recover, were done by them as military officers acting under the authority of orders of the President of the United States, during the existence of the late rebellion against the United States." This motion was properly denied, for the reason, if for no other, that there were many disputed facts in the case, disconnected from any question of authority derivable from the general orders of the President. It was the province of the jury to consider those facts in connection with such propositions of law as the

court should announce for their guidance. For like reasons, the court properly refused to charge the jury as requested by plaintiffs in error. That request altogether ignored the evidence introduced by the defendant in error, who testified, substantially, that the plaintiffs in error, under circumstances of oppression and wantonness, and by improper and fraudulent representations, procured their superior officers to continue the imprisonment longer than necessary, and prevented them from having a speedy trial in the proper court for the offence charged. It was the province of the jury to consider that evidence, and if they believed it to be true, and had discredited the opposing evidence, the defendant in error would have been entitled to a verdict by reason of any oppressive or corrupt abuse of authority on the part of the plaintiffs in error in making the arrest and ordering and continuing the imprisonment.

In the argument of the case before us a good deal was said in reference to that portion of the elaborate charge to the jury which discussed the right of the plaintiffs in error to take shelter under the act of March 2, 1863, entitled " An Act relating to *habeas corpus* and regulating judicial proceedings in certain cases," and the act of March 2, 1867, entitled " An Act to declare valid and conclusive certain proclamations of the President, and acts done in pursuance thereof, or of his orders, in the suppression of the late rebellion against the United States," — the former act, it will be remembered, authorizing defence to be made by special plea, or under the general issue. They are known as the Indemnity Acts, passed by Congress for the protection of military officers, and others who, between certain dates, made arrests, or were connected with the imprisonment and trial, under the authority of the orders and proclamations of the President, of persons charged with participation in the late rebellion, or with disloyal practices in aid thereof. Upon the part of the plaintiffs in error it is insisted that the charge was so inflammatory as to prevent a dispassionate and impartial consideration of the defence relied upon. It is further insisted that the court erred in what it said as to the right of the plaintiffs in error to justify under the provisions of the two statutes referred to. It is still further insisted that Beckwith and Henry having acted in good faith under the

directions of their superior officers, both in ordering and making the arrest, and in holding Bean in custody after such arrest, they could not, in any event, be liable for vindictive damages, however illegal their acts may have been. Touching these objections to the charge of the court, it is sufficient to say that they are not presented by the bill of exceptions in such form that we should consider them. The only exceptions to the charge are in these words: " To the omission of the court to charge as requested, and to the charge of the court placing a construction upon said acts of Congress, and to so much of the charge as relates to the attempted justification of the defendants under said act, and the evidence hereinbefore detailed, the defendants excepted."

We have already commented upon the refusal of the court to charge as requested by the plaintiffs in error. The exceptions to the charge as given are too vague and indefinite to raise the questions which were claimed in argument to arise under the acts of 1863 and 1867. *Lincoln* v. *Claflin*, 7 Wall. 132; *McNitt* v. *Turner*, 16 id. 362; *Beaver* v. *Taylor et al.*, 93 U. S. 46. The exception is scarcely more definite than a general exception to the whole charge would have been. We cannot tell what specific portion of the elaborate charge construing the acts of Congress, or what specific portions of the charge concerning the evidence relied upon for justification under those acts, were intended to be covered by this general exception. The exception was to a series of propositions in gross, relating to the construction and to the validity, in certain aspects, of these acts of Congress, and to a mass of evidence introduced for the purpose of establishing the defence allowed by those acts. Some of those propositions seem to be sound in any view of the case; but since the exception did not call the attention of the court below to the specific propositions which were objected to, it cannot be regarded here. For the same reasons, we cannot consider the alleged error of the court in its charge to the jury upon the question of vindictive damages. While some portion of the amount found by the jury may be attributed to the charge of the court upon the subject of vindictive damages, it is sufficient to say that no exception was taken upon that point. We forbear, therefore, any

expression of opinion as to whether the evidence before the jury authorized vindictive damages, or brings this case within the provisions of the statutes of 1863 and 1867. We express no opinion as to the construction of those statutes, or as to the questions of constitutional law which may arise thereunder. We feel obliged to adopt this course, because counsel for defendant in error, assuming that our decision in 18 Wallace as to the sufficiency of certain special pleas settled all the questions under the acts of 1863 and 1867, which could arise upon the evidence in this case under the general issue, did not, in his oral or printed argument, discuss the grave questions of statutory and constitutional law which, perhaps, the general exceptions to the charge were designed to present for our determination. We therefore restrict our decision to the single point properly presented for our determination; viz., that the court erred in excluding from the jury the depositions of Kinney, Brown, and Jewell, and upon that ground the judgment is reversed, with directions for such further proceedings as may be consistent with this opinion.

Upon the whole case, we are of opinion that justice will be promoted by another trial of the case; and it is

*So ordered.*

MR. JUSTICE MILLER did not hear the argument in this case or take part in its decision.

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE CLIFFORD, dissenting.

I am unable to concur in the judgment of the court in this case, and I will state the reasons for my dissent. The action is for an assault and battery upon the plaintiff, and his imprisonment in the State prison of Vermont for more than six months, without process of law, and under circumstances of great cruelty and oppression. The plaintiff is a citizen of the United States, though in 1864, when the grievances complained of were committed, he was temporarily a resident of Canada.

It appears from the uncontradicted evidence in the record, that on the 11th of November, 1864, whilst returning from

a trip to Boston to his home in the Province of Quebec, he was arrested in a passenger car near Wells River, in the State of Vermont, by the defendant Beckwith, without any warrant or process of law, and taken to Beckwith's residence in Sutton in that State; that he was there detained during the night under the charge of keepers; that his father, who lived at the distance of about fifteen miles, and for whom he had sent, arrived during the night, but that Beckwith refused to allow them to have an interview, except in his presence; that on the following day he was forcibly taken, by order of the defendant Henry, and placed in the State prison at Windsor, where he remained until the 26th of April, 1865, a period of nearly six months, when he was admitted to bail and released from imprisonment; that during this period he was locked up at night, and for the first few days in the daytime, also, in a narrow and scantily furnished cell, being one in which convicts were confined at night; that after the first few days he was allowed, upon his complaint of the coldness of the cell, to spend the day in the shops where the convicts worked, but he was required to go out and to return when they did, and at no time to be out of sight of a keeper, and not to go on the corridors or in the yard for exercise; that the food offered to him was the fare served to the convicts, which he could not eat, and that afterwards he obtained his meals from the keeper's table by paying a small sum each week; and that, during this period, no complaint against him was filed with any magistrate: he was held simply upon the order of the defendants.

And what is the excuse offered for this imprisonment and treatment; for justification there could be none in a country where there were constitutional guarantees against the invasion of personal liberty, — such as are found in the Constitution of Vermont and in the Constitution of the United States? What is the excuse? Simply this: that the defendants, one of whom was provost-marshal, and the other assistant provost-marshal, of a military district embracing Vermont, suspected that the plaintiff had aided or been privy to the desertion from the army of two substitutes, who had been furnished upon a contract with one Stevens, and for whom Stevens had paid

$1,200, of which sum $800 had been received by the plaintiff and two others. Suspecting the plaintiff, as stated, the defendants determined to hold him in the State prison until they should coerce him to the payment not merely of what he had received, but of what his supposed confederates had received also. The defendants claimed that they were acting all this time in the service of the United States; but surely this is a mere pretence, for their duties as enlisting officers did not require them to compel the return of money of which a substitute broker had been defrauded, and in which the United States had no interest, and could not have retained had these officers succeeded in coercing its payment.

After the plaintiff had been in the State prison for a few days, the defendant Henry called upon him, and verbally informed him that he was charged with aiding or being privy to the desertion of the substitutes, but that he would be discharged on payment of the $800, and $25 additional for expenses. The plaintiff protested that he was innocent of the charge, and demanded a trial. He was told in reply by Henry (whose words I quote) that " he could not have a trial, and could not get one," but that his case would be reported to the assistant general provost-marshal. He then requested Henry to make an immediate report, which he promised to do. Later in the day, being in great distress of mind and anxious to return to his family, and thinking that perhaps the money might be paid under protest, he telegraphed to his father to bring him the $800, and requested Henry to withhold the report until his father arrived. On the next day but one his father arrived, and, in an interview with Henry, told him that neither he nor the plaintiff would pay a dollar, and requested him to report the case at once. The record then reads thus (I copy the words): " From that time plaintiff constantly urged that his case should be reported, or that a trial should be given him, or that he be admitted to bail, and protested his innocence; and Henry repeatedly promised to report the case, but frequently told him and his father he could not get a trial, nor be admitted to bail, and that he would be discharged at any time on payment of the $825."

On the 20th of November following, Henry reported to his

superior officers the arrest of the plaintiff, and the reasons for it, stating that he was held for the return of the $800; and in December, Henry informed the plaintiff in writing of the charges against him, claiming that he should pay the $800 for the use of the government, with the expenses of his arrest. All the communications between the different officers of the military district, with reference to the plaintiff, show that he was held upon the charge of aiding or of being privy to the desertion of the substitutes, without any intention to bring him to trial for the offence, but to coerce, by his imprisonment, the repayment of the money which he, with two others, had received from the substitute broker. In one of his letters to the assistant provost-marshal, Henry stated, with reference to turning the case over to the district attorney, that he did not think that the plaintiff could be convicted under any section of the Enrolment Act, from any testimony which he then possessed, but that he had heard of additional facts, which might perhaps be sufficient for that purpose. No such additional facts, however, were obtained.

The record also shows that the plaintiff, throughout his imprisonment, made constant efforts, in various ways, to obtain a trial or a release on bail, which he was able and willing to furnish; and that eleven journeys were made by his father from the northern part of Vermont to Windsor and Brattleborough for that purpose. Among other efforts, the plaintiff appealed by letter to General Dix, the commander of the department, to order him to be brought to trial, and to give him an opportunity to prove his innocence. But no trial was allowed him, — that right which belongs, or ought to belong, to every one, even the humblest in the land, was denied to him, a born citizen of the United States; and not until after the intercession, at Washington, of a member of Congress from Vermont in his behalf were any steps taken for his release. His father and he had pleaded in vain to the defendant Henry, urging, among other things, that his wife, who needed his support, was about to be confined. At last, on the 26th of April, 1865, he was taken before a justice of the peace and discharged on bail.

To add to the enormity of this case, the district attorney of

the United States for Vermont states in his testimony that there were many other cases in his district, during the war, of persons charged with inciting or assisting soldiers to desert, and that they were all turned over to him to be prosecuted, and that they were prosecuted by him, in the civil courts ; but that he knew nothing of this case until April, 1865, and that soon afterwards the plaintiff was released on bail.  The grand jury of the United States court found no cause for his prosecution, though the defendant Henry told his story to them.

Whilst these things were being done in Vermont, and the plaintiff was, by the action of the defendants, lying in the State prison as absolutely helpless as though he had been immured in the dungeon of an Asiatic despot, there was no rebellion in that State against the laws and government of the United States ; there were no military operations carried on within its limits ; there was no army there.   The courts of justice, both Federal and State, were open, and in the full exercise of their jurisdiction ; and the plaintiff was not in the military service, or in any way connected with such service, and for the offence of which he was suspected, or for any other offence, could have been brought before them on any day of the year. By his imprisonment, and the report that he was in the State prison, his business was ruined, his personal property and furniture were seized by creditors and sacrificed at sheriff's sale, and his wife was compelled to leave his home and return to her friends in Vermont.[1]

On the trial of the action, the defendants relied for their defence upon the fourth section of the act of Congress of March 3, 1863, " relating to *habeas corpus*, and regulating judicial proceedings in certain cases " (12 Stat. 756) ; and upon the act of March 2, 1867, to declare valid and conclusive certain proclamations of the President, and acts done in pursuance thereof, or of his orders in the suppression of the late rebellion, — contending that under them the defendants were to be pre-

[1] As the statement contained in the opinion of the majority does not give any detailed account of the " circumstances of humiliation and severity " mentioned, to which the plaintiff was subjected, an extract from the record showing them is annexed to this opinion.  No adequate statement of the case can be made which does not substantially embody the entire bill of exceptions.

sumed to have acted by the orders of the President, and were thereby released from responsibility to the plaintiff.  14 Stat. 432.  And if they were not thus released from responsibility, then they sought to give in evidence in mitigation of damages the testimony of certain parties which was discovered long after the arrest and imprisonment of the plaintiff, tending to establish facts which, if known at that time, would have justified, to some extent, their suspicions as to his complicity in the escape of the substitutes.  The court below held that the defendants were not released from responsibility under those acts; and that evidence of the possible guilt of the plaintiff, discovered after the commission of the grievances complained of, was inadmissible in mitigation of damages.  Its ruling upon both of these positions is assigned as error by the Attorney-General; but it is upon its ruling on the first that he chiefly relies for a reversal of the judgment.  It is against that ruling that his argument is mainly directed.  This court holds that the testimony offered should have been received; and it overrules the exception to the refusal of the court below to instruct the jury that the defendants were to be presumed to have acted under the orders of the President, and that the statutes in question constituted a full and complete justification for the acts complained of, not on the ground that the statutes were invalid, or that the orders, if issued, would have afforded no justification to the defendants, but on the ground that there was evidence for the consideration of the jury whether the defendants had not by fraudulent representations induced their superior officers to continue the imprisonment of the plaintiff " longer than necessary," and prevented him from having a speedy trial in the proper court for the offence charged.[1]

In considering this case, I shall endeavor to show that the

----

[1] The charge to the jury which the court was requested by the defendants to give was that the facts which their evidence tended to establish, if believed, " constituted under the aforesaid acts of Congress a full and complete justification for each and both the defendants for the acts complained of.  And in the absence of all evidence to prove whether the President issued any order, general or special, for the arrest and detention of the plaintiff, the jury were not only at liberty, but were bound, to presume that he did; that such was the presumption of law, under the act of March 2, 1867, and that such presumption must prevail in this case, as there is no evidence to rebut it."

court below ruled correctly, as well where its ruling is pronounced erroneous as in refusing to give to the jury the instructions requested; and that its refusal in that respect should be sustained, on the ground that neither the statutes mentioned nor any orders of the President under them could constitute any justification for the arrest and imprisonment of the plaintiff. And I shall examine the propositions of law presented by the rulings in the order in which they were discussed by the Attorney-General.

The act of 1863 provided that " any order of the President, or under his authority," made during the rebellion, should " be a defence in all courts to any action or prosecution " for any search, seizure, arrest, or imprisonment under and by virtue of such order, or under color of any law of Congress.

By the act of 1867, all acts, proclamations, and orders of the President, or acts done by his authority or approval, after March 4, 1861, and before July 1, 1866, respecting martial law, military trials by courts-martial, or military commissions, or the arrest, imprisonment, and trial of persons charged with participation in the rebellion, or as aiders or abettors thereof, or as guilty of any disloyal practices in its aid, or of any violation of the laws or usages of war, or of affording aid and comfort to rebels, and all proceedings and acts of courts-martial or military commissions, or arrests and imprisonments in the premises by the authority of the orders or proclamations, or in aid thereof, — are approved, legalized, and declared valid, to the same extent and with the same effect as if the orders and proclamations had been issued, and the arrests, imprisonments, proceedings, and acts had taken place, under the previous express authority and direction of Congress. The act also declares that no person shall be held to answer in any civil court " for any act done or omitted to be done in pursuance or in aid of any of said proclamations or orders, or by authority or with the approval of the President " within the period and respecting any of the matters mentioned; and that " all officers and other persons in the service of the United States, or who acted in aid thereof, acting in the premises, shall be held *prima facie* to have been authorized by the President."

These statutes, as is apparent on their face, extend only to

acts done in compliance with express orders or proclamations of the President. They do not cover acts done by persons upon their own will and discretion, who may have been at the time in the service of the government, simply because they were under the general direction of the President as commander-in-chief. They were not intended to protect against judicial inquiry and redress every act of a subordinate in the military service in suppressing or punishing what he may have regarded as a disloyal practice, no matter how flagrant the outrage he may have thus committed against life, liberty, or property. Such was the purport of the decision of this court when this case was here before. 18 Wall. 510.

It is not pretended that any proof was produced that the arrest and imprisonment of the plaintiff were made under any express order or proclamation of the President; but it is contended by the Attorney-General that under the last clause of the act of 1867 it is to be presumed that their action was authorized by the President, and that they are thus relieved from accountability for it.

The court below held, that assuming the construction placed by the Attorney-General upon the statute to be correct, and that from the commission of the act the presumption arose that it was authorized by the President, — the act thus presumptively establishing its own validity, — the presumption in this case was repelled, inasmuch as it appeared in evidence by whose direction the orders were issued under which the plaintiff was arrested and imprisoned. It appeared that they never originated with or had the sanction of the President.

If, however, the court below erred in this respect, there is another and a conclusive answer to the defence, — one which renders futile and abortive all attempts to justify the action of the defendants under any presumed orders of the President, — and that is, that it was not within the competency of the President or of Congress to authorize or approve the acts here complained of, so as to shield the perpetrators from responsibility. It is to be borne in mind, as already stated, that the plaintiff was not in the military service of the United States; that his arrest and imprisonment were in Vermont, far distant from the sphere of military operations; that there the courts

of the United States and of the State were open and in the full exercise of their jurisdiction, and that the plaintiff could have been brought before them for any offence known to the laws; and that there, if anywhere in the United States, the provisions of the Constitution for the security of one's person from unlawful arrest and imprisonment were not superseded.

Persons engaged in the military service of the United States are, of course, subject to what is termed military law; that is, to those rules and regulations which Congress has provided for the government of the army and the punishment of offences in it. Congress possesses authority under the Constitution to prescribe the tribunals as well as the manner in which offenders against the discipline of the army and the laws for the protection of its men and officers shall be summarily tried and punished; and to the jurisdiction thus created all persons in the military service are amenable. But that jurisdiction does not extend to persons not in the military service, who are citizens of States where the civil courts are open.

It may be true, also, that on the actual theatre of military operations what is termed martial law, but which would be better called martial rule, for it is little else than the will of the commanding general, applies to all persons, whether in the military service or civilians. It may be true that no one, whatever his station or occupation, can there interfere with or obstruct any of the measures deemed essential for the success of the army, without subjecting himself to immediate arrest and summary punishment. The ordinary laws of the land are there superseded by the laws of war. The jurisdiction of the civil magistrate is there suspended, and military authority and force are substituted. The success of the army is the controlling consideration, and to that every thing else is required to bend. To secure that success, persons may be arrested and confined, and property taken and used or destroyed, at the command of the general, he being responsible only to his superiors for an abuse of his authority. His orders, from the very necessity of the case, there constitute legal justification for any action of his officers and men. This martial rule — in other words, this will of the commanding general, except in the country of the enemy occupied and dominated by the army — is limited to the

field of military operations. In a country not hostile, at a distance from the movements of the army, where they cannot be immediately and directly interfered with, and the courts are open, it has no existence.

The doctrine sometimes advanced by men, with more zeal than wisdom, that whenever war exists in one part of the country the constitutional guaranties of personal liberty, and of the rights of property, are suspended everywhere, has no foundation in the principles of the common law, the teachings of our ancestors, or the language of the Constitution, and is at variance with every just notion of a free government. Our system of civil polity is not such a rickety and ill-jointed structure, that when one part is disturbed the whole is thrown into confusion and jostled to its foundation. The fact that rebellion existed in one portion of the country could not have the effect of superseding or suspending the laws and Constitution in a loyal portion widely separated from it. The war in the Southern States did not disturb Vermont from her constitutional propriety. She did not assent to the theory that war and disturbance elsewhere could destroy the security given by her laws and government. The same juridical institutions, and the same constitutional guaranties for the protection of the personal liberty of the citizen, with all the means for their enforcement, remained there as completely as before; and the Constitution and laws of the United States were as capable of enforcement in all their vigor in that State during the war as at any time before or since. The arrest and imprisonment of the plaintiff, even if made by direct order of the President, were, therefore, in plain violation of the fifth constitutional amendment, which declares that no person shall be deprived of his liberty without due process of law. No mere order or proclamation of the President for the arrest and imprisonment of a person not in the military service, in a State removed from the scene of actual hostilities, where the courts are open and in the unobstructed exercise of their jurisdiction, can constitute due process of law, nor can it be made such by any act of Congress. Those terms, as is known to every one, were originally used to express what was meant by the terms "the law of the land" in Magna Charta, and had become synonymous with them. They were intended,

as said by this court, "to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *Bank of Columbia* v. *Okely*, 4 Wheat. 235. They were designed to prevent the government from depriving any individual of his rights except by due course of legal proceedings, according to those rules and principles established in our systems of jurisprudence for the protection and enforcement of the rights of all persons.

"By the law of the land," said Mr. Webster, in his argument in the *Dartmouth College Case*, "is most clearly intended the general law, — a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society." Those words have been held in English law to have this potency since the date of Magna Charta.

The clauses of that instrument which declare that no freeman shall be taken or imprisoned, or be disseised of his freehold or liberties or free customs, or be outlawed or exiled, or any otherwise destroyed, or be passed upon except by the lawful judgment of his peers or by the law of the land, and that justice shall not be sold, nor denied, nor delayed to any man, are considered by English jurists and statesmen to be sufficient to protect the personal liberty and property of every freeman from arbitrary imprisonment and arbitrary spoliation.

"It is obvious," says Hallam, "that these words, interpreted by any honest court of law, convey an ample security for the two main rights of civil society. From the era, therefore, of King John's charter, it must have been a clear principle of our Constitution, that no man can be detained in prison without trial." 2 Hallam, Middle Ages, c. 8, part 2, p. 310. And the same writer, in his Constitutional History of England, mentions among the essential checks upon royal authority, established under Magna Charta as part of her Constitution, "that no man could be committed to prison but by a legal warrant specifying his offence," and that "the officers and servants of the crown violating the personal liberty or other

right of the subject might be sued in an action for damages, to be assessed by a jury, or in some cases were liable to criminal process : nor could they plead any warrant or command in their justification, not even the direct order of the king." 1 Hallam, Const. Hist., c. 1, p. 3.

"The glory of the English law," says Blackstone, "consists in clearly defining the times, the causes, and the extent, when, wherefore, and to what degree the imprisonment of the subject may be lawful. This it is which induces the absolute necessity of expressing upon every commitment, the reason for which it is made, that the courts upon a *habeas corpus* may examine into its validity, and, according to the circumstances of the case, may discharge, admit to bail, or remand the prisoner." 3 Blackst. 133.

As stated by counsel, the last vestige of any claim on the part of the government of England to the right of arrest, except upon such process as was authorized by the general law of the land, was overthrown in 1765, in the celebrated contest concerning the legality of general warrants. The arrests of parties by such warrants from the Secretary of State was condemned by repeated judgments of the highest courts of England as illegal and unconstitutional, and from that day to this such warrants have never been issued. No barrister or judge in England would now have the hardihood to assert that such warrants are due process of law.

To me, therefore, it is a marvel that in this country, under a Constitution ordained by men who were conversant with the principles of Magna Charta, and claimed them as their birth-right, — a Constitution which declares in its preamble that it is established " to secure the blessings of liberty to ourselves and posterity," — it could ever be contended that an order of the Executive, issued at his will for the arrest and imprisonment of a citizen, where the courts are open and in the full exercise of their jurisdiction, is due process of law, or could ever be made such by an act of Congress. I certainly never supposed that such a proposition could be seriously asserted before the highest tribunal of the Republic by its chief legal officer. I had supposed that we could justly claim that in America, under our republican government, the personal liberty of the citizen

was greater and better guarded than that of the subject in England. It is only the extraordinary claim made by the counsel of the government in this case which justifies any argument in support of principles so fundamental and heretofore so universally recognized. It may be necessary at times with respect to them, as it is necessary at times with respect to admitted principles of morality, to restate them, in order to rescue them from the forgetfulness caused by their universal admission.

The assertion that the power of the government to carry on the war and suppress the rebellion would have been crippled and its efficiency impaired if it could not have authorized the arrest of persons, and their detention without examination or trial, on suspicion of their complicity with the enemy, or of disloyal practices, rests upon no foundation whatever so far as Vermont was concerned. There was no invasion or insurrection there, nor any disturbance which obstructed the regular administration of justice. A claim to exemption from the restraints of the law is always made in support of arbitrary power whenever unforeseen exigencies arise in the affairs of government. It is inconvenient; it causes delay; it takes time to furnish to committing magistrates evidence which, in a country where personal liberty is valued and guarded by constitutional guaranties, would justify the detention of the suspected; and, therefore, in such exigencies, say the advocates of the exercise of arbitrary power, the evidence should not be required. A doctrine more dangerous than this to free institutions could not be suggested by the wit of man. The proceedings required by the general law for the arrest and detention of a party for a public offence — the charge under oath, the examination of witnesses in the presence of the accused with the privilege of cross-examination, and of producing testimony in his favor, creating the objectionable delays — constitute the shield and safeguard of the honest and loyal citizen. They were designed not merely to insure punishment to the guilty, but to insure protection to the innocent, and without them every one would hold his liberty at the mercy of the government. " All the ancient, honest, juridical principles and institutions of England," says Burke, — and it is our glory

that we inherit them, — " are so many clogs to check and retard the headlong course of violence and oppression. They were invented for this one good purpose, that what was not just should not be convenient." [1] Whoever, therefore, favors their subversion or suspension, except when in the presence of actual invasion or insurrection the laws are silent, is consciously or unconsciously an enemy to the Republic.

If neither the order of the President nor the act of Congress could suspend, in a State where war was not actually waged, any of the guaranties of the Constitution intended for the protection of the plaintiff from unlawful arrest and imprisonment, neither could they shield the defendants from responsibility in disregarding them. Protection against the deprivation of liberty and property would be defeated if remedies for redress, where such deprivation was made, could be denied.

I pass from this subject to the second position of the defendants, that if they were not justified by the acts of Congress, so far at least as to be exempted from responsibility for their treatment of the plaintiff, they were entitled to give in evidence testimony, subsequently discovered, tending to establish the correctness of their suspicions of the complicity of the plaintiff in the desertion of the substitutes. The court below refused to admit the testimony, and this court holds that it thus erred, and, for that reason, reverses its judgment. The testimony consisted of three depositions filled with hearsay, conjectures, understandings, beliefs, and other irrelevant matter which rendered them inadmissible as a whole in any court on any subject; and on that ground they were objected to, and in my judgment ought to have been excluded. They were offered to show the guilt of the plaintiff in aiding the desertion of the substitutes, and though the evidence they furnished was of the vaguest and most unsatisfactory character, the court excluded them, on the ground that the guilt or innocence of the plaintiff was not a question for the determination of the jury; and that for the purpose of rebutting malice and showing good faith, they could not give in evidence circumstances of which they had never heard until after the commencement of the action. As facts not known at that time could not have influenced the conduct

[1] Letter to the Sheriffs of Bristol.

of the defendants, it is difficult to comprehend how proof of those facts could be received to show the motives — of malice or good faith — with which they then acted.[1]

Independently of this consideration, it seems to me that the evidence of the guilt or innocence of the plaintiff was entirely immaterial. Assuming that he was guilty of the complicity alleged, — that he had admitted his guilt to the defendants, — that circumstance would not have justified their conduct in the slightest degree. They would have been equally bound upon that assumption, as they were in fact bound, — no more and no less, — to take the plaintiff before the proper magistrate, to be proceeded against according to law. To keep him for nearly six months in the State prison among convicts, without taking him before the proper officer to be held to bail or brought to trial, was a gross outrage upon his rights, whether he were guilty or innocent. There were magistrates in every county of the State competent to act upon the charge, and the district attorney was ready to take control of all cases against the laws of the United States and prosecute them. The defendants not only omitted this plain, imperative duty, but detained the plaintiff in prison, not with a view to punish him for the offence of which they suspected him to be guilty, but to coerce from him payment of money alleged to be due by him and others to a substitute broker. Where is the law or reason for allowing one, who by force holds another in confinement in order to extort the payment of money, to show in extenuation of his conduct that the man had been guilty of some offence against the law? The answer in all such cases should be that the law attaches the proper penalties to its violation, and appoints the ministers by whom those penalties are

[1] The record reads as follows : —

"The said three depositions were offered for the purpose of satisfying the jury of the guilt of Bean by evidence which was not known to, or did not come to the knowledge of, the defendants prior to said release.

"The court excluded said depositions upon the ground that the guilt or innocence of said Bean was not a question for the determination of the jury, but that all the facts and circumstances which were known to the defendants, or with which they in any way became acquainted prior to the imprisonment, could be admitted for the purpose of rebutting malice and showing that they acted in good faith, *but that they could not give in evidence circumstances of which they had never heard until after the commencement of this suit.*"

to be enforced; and whenever they can act, whoever usurps their authority and attempts to punish supposed offenders in any other mode than that provided by the law, is himself a criminal. For, as it was said by a distinguished statesman and jurist of England, when the laws can act, "every other mode of punishing supposed crimes is itself an enormous crime."

The doctrine announced by the decision of the court in this case is nothing less than this: that a gross outrage upon the rights of a person may be extenuated or excused by proof that the outraged party had himself been guilty of some crime, or, at least, that the perpetrators of the outrage had reason to suspect that he had. This doctrine is pregnant with evil. I know not why, under it, the violence of mobs, excited against guilty or suspected parties, may not find extenuation. Let such a doctrine be once admitted, and a greater blow will be dealt to personal security than any given to it for a century.

If we turn to the adjudged cases, we shall find nothing to support, but every thing to condemn, the doctrine. Thus, in *Delegal* v. *Highley* (3 Bing. N. C. 950), which was an action brought for a malicious charge before a magistrate, the defendant pleaded that he had caused the charge to be made upon reasonable and probable cause, stating what the cause was. Upon special demurrer, the plea was held insufficient in not alleging that the defendant, at the time of the charge, had been informed of or knew the facts on which the charge was made. "If the defendant," said Chief Justice Tindal, "instead of relying on the plea of not guilty, elects to bring the facts before the court in a plea of justification, it is obvious that he must allege, as a ground of defence, that which is so important in proof under the plea of not guilty, viz. that the knowledge of certain facts and circumstances which were sufficient to make him, or any reasonable person, believe the truth of the charge which he instituted before the magistrate, existed in his mind at the time the charge was laid, and was the reason and inducement for his putting the law in motion. Whereas, it is quite consistent with the allegations in this plea that the charge was made upon some ground altogether independent of the existence of the facts stated in the plea; and that the defendant now

endeavors to support the propriety of the charge, originally
without cause, by facts and circumstances which have come to
his knowledge for the first time since the charge was made."

So, also, the converse of this doctrine is true : if a defendant
prove that, at the time of the arrest, he had reasonable cause
to believe the plaintiff guilty, this cannot be rebutted by proof
that, afterwards, he turned out to be entirely innocent. *Foshay*
v. *Ferguson*, 2 Den. (N. Y.) 617.

It will appear from an examination of the adjudged cases, as
it must on principle, that when illegal measures have been
taken to redress private wrongs, or to punish for offences
against the public, it is inadmissible to prove, in mitigation of
actual or exemplary damages, that the party injured was guilty
of the offence or misconduct constituting the provocation to
the illegal measures, except where the provocation is of a per-
sonal character calculated to excite passion, and so recent as to
create the presumption that the acts complained of were com-
mitted under the influence of the passion thus excited. Thus,
in an action of trespass for destroying or injuring certain
dwelling-houses, it was held by the Supreme Court of Maine
incompetent for the defendant to prove in mitigation of dam-
ages that they were occupied as houses of ill-fame. *Johnson* v.
*Farwell*, 7 Me. 378. So, in a similar action, for shooting into
a house in the night-time, it was held by the Supreme Court of
Illinois that the defendant could not prove, in mitigation of
exemplary damages, the kidnapping and seduction of his
daughter by the plaintiff and her husband, done nearly a year
previous. *Huftalin* v. *Misner*, 70 Ill. 55. And in trespass for
tearing down the plaintiff's house, evidence that it was occupied
by disreputable females as a disorderly house, whereby the
defendant had suffered serious injury and disturbance, was
held by the Supreme Court of New Hampshire inadmissible
either to rebut the presumption of malice or in answer to a
claim for exemplary damages. *Perkins* v. *Towle*, 43 N. H.
220. See also *Weston* v. *Gravlin*, 49 Vt. 507.

Many other illustrations might be adduced from the adjudi-
cations of the State courts. They are founded upon the plain
principle that no one can be allowed to undertake the punish-
ment of wrong-doers according to his own notions; that the

administration of punitive justice for all offences is confided by the law to certain public officers, and whoever assumes their functions without being authorized usurps the prerogative of sovereign power, and becomes himself amenable to punishment. He shall not be permitted to set up the real or supposed offences of others to justify his own wrong.

Here, the defendants having, by a gross abuse of their official authority, confined the plaintiff in a State prison among convicts for many months, not that he might be prosecuted for a public offence, but for the avowed purpose of coercing the payment of money, they ought not to be permitted to set up, either in mitigation of actual or exemplary damages, that the plaintiff was guilty of an offence for which the law had prescribed another and different punishment. In the whole range of adjudications in the English and American courts I can find no ruling which sanctions the admission of such testimony for any purpose.

There is nothing in the cases cited in the opinion of the majority from the English Common Pleas, or from the decisions of the courts of Ohio, Kentucky, and Illinois, which has any relevancy to the question here presented, as any one may satisfy himself by their examination. The circumstances of which evidence was there allowed existed and were known when the grievances complained of were committed, and tended to establish probable cause for them. There is no intimation in any of the cases of the novel doctrine, now for the first time announced, that subsequently discovered evidence could be received in extenuation of conduct not founded upon it.

The charge of the court to the jury was, except perhaps in one particular, as favorable to the defendants as the case permitted. It gave a succinct and clear statement of the facts, and declared the law applicable to them with precision and accuracy. It told them that the arrest of the plaintiff was of little consequence as compared with his imprisonment; that had he been taken at once before a United States commissioner, the arrest without a warrant, though an illegal act, would have called for small damages; and that the importance of the case consisted in his imprisonment and the purpose of it. In adding that after the plaintiff was imprisoned it was not the

purpose of the defendants to try him in the civil courts, but to hold him with a strong hand until the money was paid, the court merely stated what the uncontradicted evidence on the trial established, and what was not disputed. For this, said the court, "he is entitled to just damages, to be recompensed for his expenses, to be paid for the suffering to body and mind from confinement in a common cell in the State prison, for the disgrace, for the separation from his family at a time when it was very important that he should not be separated from them; in brief, for the loss of his personal liberty, and for the immediate and necessary losses in his business resulting from his confinement, and to the pecuniary loss which he immediately and directly sustained." To this the court added, that if the defendant Henry was influenced in all his conduct by a determination to prevent the release of the plaintiff, and to hold him after he was ordered to be turned over to the civil authorities, and was thus guilty of malice or ill-will, the jury might give, in addition to remunerative, punitive damages; that is, such sum as would punish him for the malice exhibited, and teach him and others to refrain from similar conduct.

The case here is much stronger than that of *Mitchell* v. *Harmony*, reported in the 13th of Howard. There the property of the plaintiff had been seized by an officer of the army of the United States upon the belief that he was unlawfully engaged in trading with the enemy. It turned out that he had been permitted by the Executive Department of the government to trade with the inhabitants of neighboring provinces of Mexico which were in the possession of the military authorities of the United States. In an action for trespass for seizing the property, the defendant, among other reasons, justified the seizure on the ground that he acted in obedience to the order of his commanding officer, and, therefore, was not liable. But the court answered, Mr. Chief Justice Taney speaking for it, by referring to the case of Captain Gambier, mentioned by Lord Mansfield in his opinion in *Mostyn* v. *Fabrigas* (1 Cowp. 180), and observing, that "upon principle, independent of the weight of judicial decision, it can never be maintained that a military officer can justify himself for doing an unlawful act by producing the order of his superior. The order may palliate, but it can never

justify." And in that case the court added that the defendant did not stand in the situation of an officer who merely obeys the command of his superior, for it appeared that he advised the order, and volunteered to execute it, when that duty more properly belonged to an officer of an inferior grade.

Here the defendant Henry was especially officious in securing the arrest and in continuing the imprisonment of the plaintiff. He advised the arrest; he insisted upon the imprisonment until the payment of the $800 was coerced, and he urged against turning the case over to the civil tribunals. The spirit which actuated him as well as Beckwith is shown in their telling the plaintiff at Sutton, on the day of his arrest, and afterwards, when in confinement in the State prison, " that if they could not hold him as privy to the desertion, they should take him to Canada, to be prosecuted there under the foreign enlistment acts for enlisting the men, unless he paid over the money."

The case of Captain Gambier, mentioned by Lord Mansfield and referred to by Mr. Chief Justice Taney, was this : By order of an admiral of the English navy he had pulled down the houses of some sutlers in Nova Scotia who were supplying the sailors with spirituous liquors, by which their health was injured. " The motive," says the Chief Justice, " was evidently a laudable one, and the act was done for the public service. Yet it was an invasion of the rights of private property, and without authority of law, and the officer who executed this order was held liable to an action, and the sutlers recovered against him to the value of the property destroyed." " This case," he adds, " shows how carefully the rights of private property are guarded by the laws of England; and they are certainly not less valued nor less securely guarded under the Constitution and laws of the United States."

The only criticism perhaps to which the charge is open is, that it does not distinguish between the conduct of the defendant Beckwith and that of the defendant Henry. The former does not appear from the evidence to have been as officious and persistent as the latter in efforts to hold the plaintiff until the money was coerced from him. But no objection to the charge was made on this ground; nor does it appear that on the trial

any distinction was drawn as to the extent of liability between the two defendants, or that any other than compensatory damages were allowed by the jury. They may well have supposed that the amount awarded was at best but poor compensation. Few, indeed, would consider the verdict given as sufficient for the disgrace, humiliation, and suffering wantonly inflicted upon the plaintiff. As punitive damages, the verdict was not at all excessive. On this last point I will quote from only one case, decided in 1763. It is the case of *Huckle* v. *Money* (2 Wilson, 205), tried before the Chief Justice of the Common Pleas of England. The plaintiff was a journeyman printer, and was taken into custody by the defendant, the king's messenger, upon suspicion of having printed a newspaper called the " North Briton," and was kept in custody six hours ; but he was used civilly, so that he suffered little or no damages. The defendant attempted to justify under a general warrant of the Secretary of State to apprehend the printers and publishers of that paper ; but the justification was overruled by the Chief Justice, and the plaintiff recovered £300 as damages. A new trial was moved for on the ground that this amount was excessive, it being in evidence that the printer received only weekly wages of a guinea. But the motion was denied, and in giving the decision of the court the Lord Chief Justice said : " That if the jury had been confined by their oath to consider the mere personal injury only, perhaps £20 damages would have been thought damages sufficient ; but the small injury done to the plaintiff, or the inconsiderableness of his station and rank in life, did not appear to the jury in that striking light in which the great point of law touching the liberty of the subject appeared to them at the trial ; they saw a magistrate over all the king's subjects, exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom, by insisting upon the legality of this general warrant before them ; they heard the king's counsel, and saw the Solicitor of the Treasury, endeavoring to support and maintain the legality of the warrant in a tyrannical and severe manner ; — these are the ideas which struck the jury on the trial, and I think they have done right in giving exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to pro-

cure evidence, is worse than the Spanish inquisition, — a law under which no Englishman would wish to live an hour : it was a most daring public attack made upon the liberty of the subject : I thought that the twenty-ninth chapter of Magna Charta, *Nullus liber homo capiatur et imprisonetur, etc., nec super eum ibimus, etc., nisi per legale judicium parium suorum vel per legem terræ, etc.,* which is pointed against arbitrary power, was violated."

I am clearly of opinion that the judgment of the court below should be affirmed.

The following statement of the character of the evidence given on the trial touching the treatment of the plaintiff is printed from the record in the case : —

" The plaintiff's evidence tended to show that on the eleventh day of November, A.D. 1864, while on his return from a trip to Boston, to his home in Coaticook, in the Province of Quebec, he was arrested in a passenger-car, near Wells River, in the State of Vermont, by defendant Beckwith, without any warrant or process of law, and taken from thence to Sutton, Vt.

" That Beckwith at first proposed to take plaintiff to St. Johnsbury jail, but afterwards decided to take him to his (Beckwith's) residence at Sutton, to which place he was then on his way, for the purpose of allowing plaintiff to see his father, who lived about fifteen miles from Sutton.

" That said Beckwith kept the plaintiff there through the ensuing night, under charge of keepers ; that the plaintiff's father, for whom the plaintiff sent after his arrival at Sutton, came there during the night, but Beckwith refused to allow the plaintiff to have an interview with his father except in his (Beckwith's) presence.

" That on the following day defendant forcibly and against the will of the plaintiff took him, and by order of Gilman Henry, the other defendant, placed him in the State's prison, at Windsor, Vt., where he remained until on or about the twenty-sixth day of April, 1865, when he was admitted to bail, and released from said imprisonment.

" That during all that time he was locked up in the night-time, and for the first few days in the daytime also, in a narrow and scantily furnished cell, being one of those in which convicts in the State's prison were confined at night ; that after the first few days he was allowed, upon his complaint of the coldness of the cell in the daytime, to spend the day in the shop where the convicts worked, but was required to go out and return to his cell when they did, and not at any time to be out of sight of a keeper, nor to go upon the corridors or in the yard for exercise ; that the food offered him was the fare served to the convicts, and which he could not eat ; and thenceforth he obtained his meals to be sent to him from the keepers' table, by paying three dollars per week, which he paid during the whole time.

" The plaintiff's evidence further tended to show that he was informed, at or soon after the time of his arrest, by defendants, that he was charged with being one of three persons who had received $800 of money paid for two men who had enlisted in the army in June previous as substitutes, and had immediately

deserted, as more particularly stated hereafter, and with being privy to their desertion.

"That he was imprisoned on Saturday, and saw no one but the keepers till the Monday following, when defendant Henry came to see him; that Henry told him he could be discharged on payment of the $800, and $25 more for expenses; that the plaintiff protested his innocence and demanded a trial; that he was told by Henry he could not have a trial, and could not get one, but that his case would be reported to Major Austine, at Brattleboro', assistant provost-marshal-general.

"That plaintiff thereupon requested him to make immediate report, which he promised to do. That later in the same day the plaintiff being in much distress of mind and anxiety to return to his family, and thinking perhaps the money might be paid under protest, telegraphed to his father to come and bring $800, and sent word to Henry, by the messenger who took the despatch, requesting him not to report the case till his father arrived, which he expected would be on the following day.

"That his father arrived on the next day but one. That his father had an interview with Henry, and said to him that neither he nor the plaintiff would pay a dollar, and requested him to report the case at once.

"He was further told by both defendants, both at Sutton and after his confinement at Windsor, that if they could not hold him as privy to the desertion they should take him to Canada to be prosecuted there under the foreign-enlistment acts for enlisting the men, unless he paid over the money.

"That from that time plaintiff constantly urged that his case should be reported, or that a trial should be given him, or that he be admitted to bail, and protested his innocence. And Henry repeatedly promised to report the case, but frequently told him and his father he could not get a trial, nor be admitted to bail, and that he would be discharged at any time on payment of the $825.

.     .     .     .     .     .     .     .     .     .     .     .

"The plaintiff's evidence further tended to show that throughout his imprisonment he made constant efforts in various ways to obtain a trial, or a release on bail, which he was able and willing to furnish; that his father made eleven journeys from the northern part of Vermont to Windsor, Brattleboro', &c., for that purpose; that among other efforts he addressed to Major-General Dix, then in command of that department, the following letter: —

"'WINDSOR STATE'S PRISON,
"'Jan. 21, 1865.

"'Maj.-Gen. J. A. DIX:

"'SIR, — I am told by one Daniel Beckwith, a deputy provost-marshal here, by whom I have been committed here on a charge (of which I am entirely innocent) of aiding or being privy to the escape of two substitutes who had received $800 paid them by one Stevens, and that you have ordered my imprisonment here till I pay the $800 and expenses.

"'If I am guilty of aiding a soldier to desert, I ought to be punished, and I cannot see, sir, how (I say it respectfully) you have any right to order my imprisonment for any indefinite time without giving me an opportunity to prove my innocence.

"'I ask nothing but what is right, and the right of every citizen of the United States; that is, a trial.

" ' I do not believe, sir, that you have made any such orders, but the fact is, I am kept in prison ever since Nov. 11, 1864, my family suffering and my character defamed, and a trial denied me.

" I am told, sir, there is a United States attorney in Vermont whose duty it is to investigate such matters, and I respectfully ask, sir, if the matter is within your jurisdiction, that he be directed to bring me to trial; and if the government is not ready for trial, I can find any number of respectable people who will become my bail until such time as the government is ready to try me.

" ' Again, sir, I ask you candidly and respectfully to order a complaint to be made against me, and, if proved guilty, I must suffer the consequences.

" ' Yours respectfully,
" ' ANDREW J. BEAN.'

" That said Bean obtained the intercession at Washington of Mr. Baxter, a member of Congress from Vermont.

" His evidence further tended to show that he learned early in April of an order for his release having been sent from Washington, and made, as did his father, urgent efforts to obtain his release, as his wife was then about to be confined; that he did not succeed, though repeated applications were made to Henry, until the 26th of April, and after the confinement of his wife, when Henry brought him before a justice of the peace of Windsor, who took bail for his appearance before a United States commissioner when called on."