**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DAVID RANDALL; TAMARA MARSHALL,
in her individual capacity and in her
capacity as parent and custodian of
Shanequia Marshall, a minor; JERRY
VANCE; EDWARD JONES; DANA
WILLIAMS; YOLANDA HAMLET; JERRY
L. SWINT; CARLOS R. MARSHALL;
JASON P. MOBLEY; JERMAINE E.
MAYHEW; STEPHEN J. MCABEE,
                    *Plaintiffs-Appellees,*

and

JOHN WILLIAMS; ELOISE JONES;
FRANCINE C. WILLIAMS,
                    *Plaintiffs,*

v.

PRINCE GEORGE'S COUNTY,
MARYLAND; JAMES M. SILVERS,
Corporal; DAVID ROSSER, Corporal,
ID #1784; STEPHAN RICKER,
Detective, #706, retired; F. MICHAEL
MCQUILLAN, Lieutenant, #521;
GEORGE A. SWOPE, Sergeant, #878,
                    *Defendants-Appellants,*

and

WAYNE CURRY, individually and in
his official capacity; JOHN FARRELL,
Chief, in his official capacity;
ALPHONSO HAWKINS, individually and

No. 01-1347

in his official capacity; KENNETH BAILEY, Detective; DARRIN PALMER, Detective; PRINCE GEORGE'S COUNTY POLICE DEPARTMENT; HARRY W. OLDFIELD, III, POFC, ID #2025; STEVEN M. KERPELMAN, Corporal, ID #1123; COLLEEN MALLON, Corporal, #1499; SHIRLEY L. MCCAFFREY, Corporal, #1221; ANDREW K. ROSITCH, Corporal, #1264; KEITH A. HARMON, #688, retired; JOSEPH R. HOFFMAN, Corporal, #1600; KENDRICK BAILEY #1794; STEPHEN J. BERRY, Corporal, #1027; JOE B. WALKER, Corporal, #1321; JOHN PIAZZA, Corporal, #1353; JEFFREY P. REICHERT, Corporal, #31587; KENNETH O'BERRY, Detective, Corporal, #1308; WILLIAM B. EVARTT, Corporal, #1592; ROBERT SHEEHAN, Corporal, #735; EDWIN ROBERTSON, Corporal, #1233; THOMAS R. BROWN, Corporal, #1064; PERCEL O. ALSTON, Corporal, #1171; RONALD P. LEDONNE, Sergeant, #911; CLIFFORD HOLLY, Captain, Individually and in his official capacity; PATRICK MUSSELMAN, Corporal, #1425; ROGER IRVIN, Corporal; PAUL EVANS, Sergeant, #946; HOWARD SHOOK, JR., Corporal, #662; DANIEL L. HUSK, Captain, #650; OPHUS ROBERTSON, Corporal, retired; UNKNOWN OFFICERS, #1-10,

*Defendants.*

DAVID RANDALL; TAMARA MARSHALL,
in her individual capacity and in her
capacity as parent and custodian of
Shanequia Marshall, a minor; JOHN
WILLIAMS; JERRY VANCE; ELOISE
JONES; EDWARD JONES; DANA
WILLIAMS; YOLANDA HAMLET; JERRY
L. SWINT; CARLOS R. MARSHALL;
JASON P. MOBLEY; JERMAINE E.
MAYHEW; STEPHEN J. MCABEE,
                    *Plaintiffs-Appellants,*

                and

FRANCINE C. WILLIAMS,
                            *Plaintiff,*

                v.                                           No. 01-1392

PRINCE GEORGE'S COUNTY,
MARYLAND; JAMES M. SILVERS,
Corporal; DAVID ROSSER, Corporal,
ID #1784; STEPHAN RICKER,
Detective, #706, retired; F. MICHAEL
MCQUILLAN, Lieutenant, #521;
GEORGE A. SWOPE, Sergeant, #878,
                    *Defendants-Appellees,*

                and

WAYNE CURRY, individually and in
his official capacity; JOHN FARRELL,
Chief, in his official capacity;
ALPHONSO HAWKINS, individually and

in his official capacity; KENNETH BAILEY, Detective; DARRIN PALMER, Detective; PRINCE GEORGE'S COUNTY POLICE DEPARTMENT; HARRY W. OLDFIELD, III, POFC, ID #2025; STEVEN M. KERPELMAN, Corporal, ID #1123; COLLEEN MALLON, Corporal, #1499; SHIRLEY L. MCCAFFREY, Corporal, #1221; ANDREW K. ROSITCH, Corporal, #1264; KEITH A. HARMON, #688, retired; JOSEPH R. HOFFMAN, Corporal, #1600; KENDRICK BAILEY #1794; STEPHEN J. BERRY, Corporal, #1027; JOE B. WALKER, Corporal, #1321; JOHN PIAZZA, Corporal, #1353; JEFFREY P. REICHERT, Corporal, #31587; KENNETH O'BERRY, Detective, Corporal, #1308; WILLIAM B. EVARTT, Corporal, #1592; ROBERT SHEEHAN, Corporal, #735; EDWIN ROBERTSON, Corporal, #1233; THOMAS R. BROWN, Corporal, #1064; PERCEL O. ALSTON, Corporal, #1171; RONALD P. LEDONNE, Sergeant, #911; CLIFFORD HOLLY, Captain, Individually and in his official capacity; PATRICK MUSSELMAN, Corporal, #1425; ROGER IRVIN, Corporal; PAUL EVANS, Sergeant, #946; HOWARD SHOOK, JR., Corporal, #662; DANIEL L. HUSK, Captain, #650; OPHUS ROBERTSON, Corporal, retired; UNKNOWN OFFICERS, #1-10,

*Defendants.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-96-2296-AW)

Argued: December 3, 2001

Decided: August 14, 2002

Before WIDENER, MICHAEL, and KING, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Michael joined. Judge Michael wrote a concurring opinion.

_____

## COUNSEL

**ARGUED:** Jay Heyward Creech, Laura Jean Gwinn, Upper Marlboro, Maryland, for Appellants. Kenneth Everett McPherson, Riverdale, Maryland, for Appellees. **ON BRIEF:** Sean D. Wallace, Upper Marlboro, Maryland, for Appellants. David P. Olslund, Cherry Hill, New Jersey, for Appellees.

_____

## OPINION

KING, Circuit Judge:

These appeals arise from a jury verdict rendered against five law enforcement officers in the District of Maryland in October 2000. The verdict awarded compensatory and punitive damages to the plaintiffs, pursuant to the provisions of 42 U.S.C. § 1983[1] and Article 24 of the

_____

[1]Section 1983 of Title 42 of the United State Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Maryland Declaration of Rights.[2] The five officers have appealed the judgment of the district court, and the plaintiffs have cross-appealed certain pre-verdict rulings and the attorneys' fee award made to them. As explained below, we affirm the judgment as to two of the officers and the court's pre-verdict rulings. We vacate the judgment against the other three officers, however, and we vacate and remand the award of attorneys' fees.

## I.

On the evening of April 26, 1995, Corporal John Novabilski, a police officer in Prince George's County, Maryland, was murdered as he sat in his police cruiser. This event resulted in an extensive search and investigation by the County's Police Department (the "County Police"), during which they encountered the fourteen plaintiffs (collectively, the "Plaintiffs") in this proceeding.[3] The Plaintiffs subsequently filed suit in the state court of Prince George's County and, on July 19, 1996, their case was removed to the District of Maryland. After resolution of several procedural issues, the Plaintiffs, on April 29, 1998, filed their fifty-five count final amended complaint (the "Complaint"). They therein asserted various claims against several County Police officers, and against the County itself, pursuant to § 1983, Article 24 of the Maryland Declaration of Rights ("Article 24"), and Maryland tort law. They contended in substance that the

---

[2]Article 24 of the Maryland Declaration of Rights, the state's constitutional equivalent to the Fourteenth Amendment, provides:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, . . . or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

[3]The fourteen plaintiffs are David Randall, Edward Jones, Dana Williams, Jermaine Mayhew, Carlos Marshall, Jerry Swint, Steve McAbee, Jason Mobley, Yolanda Hamlet, Eloise Jones, Tamara Marshall, Shanequia Marshall, Jerry Vance, and John Williams. The Complaint included a fifteenth plaintiff, Francine Williams, who alleged police misconduct arising out of a separate incident. The officers sued by Francine Williams were awarded summary judgment, and she is not a party to either of these appeals.

County Police had assaulted and unlawfully detained them during the Novabilski investigation.

Following discovery, the defendants sought summary judgment on the Plaintiffs' claims and, on September 13, 1999, the court awarded summary judgment to them on the Maryland tort claims and on the *Monell* claims against Prince George's County.[4] The case thereafter proceeded to trial on claims of police misconduct during the Novabilski investigation, in contravention of the Plaintiffs' state and federal constitutional rights. The trial consumed nearly three weeks, from October 10 through October 27, 2000, and before the case was submitted to the jury, twenty of the twenty-seven defendants were dismissed. At the conclusion of its deliberations, the jury found three supervisory officers, Lieutenant F. Michael McQuillan, Sergeant George Swope, and Corporal Stephen Ricker (the "Supervisors"), liable to twelve of the Plaintiffs (the "Appellees"). The verdict against the Supervisors was based on the indirect liability concepts of "bystander" and "supervisory" liability, and the Appellees were awarded both compensatory and punitive damages under § 1983 and Article 24. The jury found two other officers, Corporals David Rosser and James Silvers (the "Corporals"), liable to Plaintiff Randall for a violation of Article 24. In post-trial proceedings, the district court, pursuant to 42 U.S.C. § 1988, awarded the Plaintiffs the sum of $195,000 for attorneys' fees and costs.[5]

---

[4]A *Monell* claim asserts § 1983 liability against a municipal or county government. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978). In *Monell*, the Court held that municipalities may be liable under § 1983 for unconstitutional or illegal policies. *Id.* at 694. In this case, the Plaintiffs alleged that the officers who violated their rights were "operating under unconstitutional customs, policies and practices of Prince George's County," and that the County had failed to properly train and supervise its police officers. Complaint at ¶¶ 214-16, 396-99. *See infra* Part V.A.

[5]Section 1988 of Title 42 of the United States Code provides in pertinent part:

> In any action or proceeding to enforce a provision of . . . [section] 1983 . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . .

The Supervisors and the Corporals, plus Prince George's County (collectively, the "Appellants"), have appealed the adverse judgment, challenging both the liability of the Supervisors and the damage awards made to the Appellees.[6] The Appellants maintain that the evidence was insufficient to warrant a verdict against the Supervisors on any theory of indirect liability, and they contend that the damage awards are excessive.

The fourteen Plaintiffs have cross-appealed, contending that the evidence was sufficient to defeat summary judgment on their *Monell* claims, and also maintaining that the award of attorneys' fees was insufficient and erroneously calculated.[7] After first reviewing the factual underpinnings of these claims, we address the issues in turn.

II.

A.

In order to properly assess the issues on appeal, we must first understand the events that occurred in Prince George's County in the thirty-six hour period following the murder of Corporal Novabilski. In describing the evidentiary predicate for these events, we utilize four sub-parts: (1) The Parties; (2) the April 26-27, 1995 Search (the "First Search"); (3) the April 27-28, 1995 Detentions (the "Detentions"); and (4) the April 28, 1995 Search (the "Second Search").[8]

---

[6]Prince George's County was found liable to each successful plaintiff for Article 24 violations under a theory of respondeat superior. As a result, under Maryland law, the County is jointly and severally liable for the compensatory damage awards made to the Appellees. *DiPino v. Davis*, 729 A.2d 354, 372 (Md. 1999) ("[L]ocal government entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.").

[7]Although all fourteen Plaintiffs have cross-appealed, only twelve actually recovered damages in the district court. Thus, while there are fourteen Plaintiffs, there are only twelve Appellees.

[8]In the context of a jury verdict in favor of the Appellees, we must accept the evidence presented at trial in the light most favorable to them. *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442-43 (4th Cir. 2000).

## 1. *The Parties*

### a.

The fourteen Plaintiffs are connected in varying ways to the residence located at 7211 East Forest Road in Landover, Maryland ("7211"). Between April 26 and April 28, 1995, the following thirteen persons were either living or present at 7211:

- Eloise Jones, the owner of 7211, lived there with her adult children: Edward Jones, Carlos Marshall, and Tamara Marshall;

- Tamara Marshall's two children, Carlton and Shanequia, lived at 7211, and Tamara's boyfriend, David Randall, was staying there;

- Eloise's brother, John Williams, and her first cousin, Jerry Vance, lived in the basement of 7211;

- Eloise's nephew, Dana Williams, and Dana's friend, Steve McAbee, slept at 7211; and

- Carlos Marshall's girlfriend, Yolanda Hamlet, and her baby, were also staying at 7211.

With the exception of Carlton Marshall and Hamlet's baby, each of these persons is a plaintiff in this proceeding. These eleven plaintiffs are joined by three others who visited 7211 on April 27, 1995: Jerry Swint (a cousin of Eloise Jones), Jermaine Mayhew, and Jason Mobley (friends of Carlos Marshall and Edward Jones).

### b.

The Appellants are five members of the County Police, plus the County itself. Three Appellants (Ricker, Swope, and McQuillan) are

---

With respect to the court's award of summary judgment to the County, we must view the evidence in the light most favorable to the non-moving party, i.e., the Plaintiffs. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Our review of the facts is therefore set forth in that light.

the County Police officers who supervised the Novabilski investigation. The primary responsibility for investigating and apprehending Novabilski's murderer rested with the Homicide Unit of the Criminal Investigations Division ("CID") of the County Police. The CID, a division of the County Police Bureau of Investigative Services, is responsible for major criminal investigations in the County. It is divided into four units: Homicide, Sexual Assault, Robbery, and Special Investigations. At the time of the murder, the Homicide Unit was commanded by Lieutenant McQuillan, and it was comprised of three squads. Each squad had a sergeant as its squad supervisor, and each squad also had five or six detectives. The Novabilski investigation was assigned to Corporal Ricker, a detective whose squad supervisor was Sergeant Swope. The three Supervisors (McQuillan, Swope, and Ricker) bore primary responsibility for the conduct of the investigation.

The other three Appellants are the Corporals and the County itself. Corporals Rosser and Silvers were members of the County Police who encountered nine of the plaintiffs during the First Search on April 26-27, 1995. The County is a party to these appeals due to its respondeat superior liability under Maryland law. *See supra* note 6.

### 2. *The First Search*

After Corporal Novabilski was fatally shot, the murderer stole his service revolver and, according to witnesses, fled into the surrounding neighborhood. Several members of the County Police, including Corporal Rosser, promptly arrived at the liquor store parking lot where the murder occurred, and they quickly dispersed in search of the assassin. Approximately fifteen minutes after the 11:20 p.m. shooting, Corporal Henry Oldfield observed two men, Plaintiffs Edward Jones and Dana Williams, standing next to a burgundy Dodge Diplomat parked in front of 7211, which is located a short distance from the crime scene. Corporal Oldfield promptly conducted a stop and frisk procedure on the two men and radioed for back-up support.

Several officers responded to the request for assistance, including the Corporals (Rosser and Silvers). Upon arriving at the residence, the Corporals approached 7211 and spoke with Plaintiff Eloise Jones. Corporal Rosser then entered 7211 and encountered Jones's daughter,

Plaintiff Tamara Marshall. He continued upstairs into a bathroom and discovered Plaintiff Randall in the bathtub. Rosser then gave Randall his boxer shorts and directed him outside for an interview.[9] Based on Randall's heavyset build and the fact that he did not appear to be out of breath, the Corporals did not consider him to be a perpetrator of the murder. Randall, along with, among others, Plaintiffs Edward Jones, Dana Williams, Vance, McAbee, and John Williams, were then lined up on their knees near a yard fence and questioned for about sixty minutes concerning the murder. Corporal Oldfield took photographs, obtained clothing samples, and recorded the physical features of the men at the fence. They were then released and advised to stay off the streets for the balance of that night.

### 3. *The Detentions*

#### a.

In its effort to identify and locate the culprit, the Homicide Unit enlisted and utilized officers from other CID units, and CID personnel conducted multiple investigative interviews in the early hours of April 27, 1995. Early on the morning of April 27, 1995, Darryl Hensley, a purported witness to the murder, was brought to the building that houses the CID offices (the "CID Station").[10] Hensley, who was inter-

---

[9]The Corporals insisted at trial that they only entered the foyer of 7211, and that they did so with Eloise Jones's consent. They denied going upstairs and removing Randall from the bathtub. Because the jury found for Randall, however, we must accept the Plaintiffs' version of the First Search.

[10]Each of the four CID units maintains an office in the CID Station, and each office consists of an open area with detectives' desks and three interview rooms. Most interview rooms are small and windowless, and they have a metal loop protruding from one wall. On occasion, individuals being interviewed are secured to the loop. The interview rooms can be locked from the outside, but they are not soundproof. The CID Station also has a large conference room at its center, which served as the command post for the Novabilski investigation.

The CID Station is adjacent to the building which serves as County Police headquarters for the Landover area, designated as the District III station (the "District III Station"). The CID Station is attached to the District III Station through connecting hallways with interior security doors. Although the CID Station has no holding cells, the District III Station contains cells sometimes utilized by CID.

viewed extensively, reviewed photographs and identified Jeffrey Gilbert, a nephew of Plaintiff Eloise Jones, as Corporal Novabilski's murderer. At approximately 5:30 p.m. on April 27, 1995, an arrest warrant was obtained for Gilbert, charging him with Novabilski's murder. At about that time, CID personnel discovered that the burgundy Dodge Diplomat that had been parked in front of 7211 the previous evening was registered to Gilbert. Search warrants were then obtained for both the Diplomat and the residence at 7211.

At approximately 9:00 p.m. on April 27, 1995, Lieutenant McQuillan conducted a briefing on the Novabilski investigation at the CID Station, and teams of officers were assigned to surveillance duty at 7211 and to locate the Diplomat. Over the course of the night, the surveillance officers stopped nine of the plaintiffs — Randall, Swint, McAbee, Edward Jones, Dana Williams, Carlos Marshall, Mayhew, Mobley, and Hamlet — in the vicinity of 7211.

b.

The stops made by the officers monitoring 7211 shared the common characteristics of what is known as a "high-risk felony stop."[11] In each instance, officers approached an individual or vehicle with their weapons drawn, contacted CID by radio, and advised the radio operator of the individual's identity. The nine plaintiffs stopped near 7211 were delivered to the CID Station through its back entrance, which is normally utilized only for persons in custody. Upon their arrival, they were taken to separate interview rooms, handcuffed to the metal loop protruding from the wall, and then interviewed.[12]

---

[11]The "high-risk felony stop" procedure is utilized when there is a likelihood that an officer or another person could be injured. Occupants of a stopped vehicle are directed to exit the vehicle with their hands up and to walk backwards slowly. They are then directed to turn around so that the officers can ascertain whether they are armed. Such persons may also be directed to kneel, and they may be handcuffed to ensure officer and public safety.

[12]The metal loop was located on one wall, and a metal chain extended from it with a handcuff on its end. An individual being interviewed would sit in a chair and might be secured on one wrist by the handcuff on the chain. As such, the individual would effectively be handcuffed to the wall.

Gilbert, for whom the arrest warrant had been issued on April 27, 1995, was located, apprehended, and delivered to the CID Station at approximately 2:30 a.m. on April 28, 1995. After the arrest, the authorities released Plaintiff Dana Williams; the other eight plaintiffs, however, remained at the CID Station for up to nine hours after Gilbert's apprehension.[13] The relevant experiences of these nine plaintiffs are summarized below.

### (1) Plaintiff Randall

Shortly after 9:30 p.m. on April 27, 1995, the officers at 7211 stopped the burgundy Dodge Diplomat, which was being driven by Plaintiff Randall. Randall was transported to the CID Station, taken to an interview room, and handcuffed to a wall. At Sergeant Swope's direction, Detective Andrew Rositch interviewed Randall and reported the contents of the interview to Swope. Rositch did not release Randall because he understood that only the lead investigator, Corporal Ricker, or one of the other Supervisors, possessed the authority to release him. Officer Keith Harmon later questioned Randall again, but also did not release him.

Plaintiff Randall was moved to other interview rooms during the night and, after each move, was handcuffed to a wall. At about 5:00 a.m. on April 28, 1995, Randall was taken to the District III Station, registered as a prisoner, and locked in a cell.[14] He was released from the cell approximately an hour later, and, after retrieving his property, left the CID Station around 9:00 a.m. on April 28, 1995.

---

[13]The Plaintiffs were not the only civilians present at the CID Station that night. As one CID sergeant observed, "[A]ll the units housed in [the CID Station] generate their business, so to speak, through civilian victims, witnesses. That's the nature of what we do." There were therefore many individuals at the CID Station on the night of April 27-28, 1995, as a result of investigations wholly unconnected to the murder. Moreover, CID interviewed approximately one hundred individuals at the CID Station in connection with the Novabilski investigation.

[14]The County Police registered prisoners by photographing and fingerprinting, itemizing personal effects, and recording names in the log.

### (2) Plaintiff Swint

Sometime before 10:00 p.m. on April 27, 1995, the surveillance officers stopped Plaintiff Swint, who was exiting 7211 on foot. They transported him to the CID Station, where either Swope or Ricker directed Corporal Edwin Robertson to interview him. Swint cooperated and signed a statement. However, he was not released because, according to Robertson, only the lead investigator had the authority to release him. Swint remained locked in an interview room until 9:00 a.m. on April 28, 1995, when he was heard banging on the door. He was then released from the CID Station.

### (3) Plaintiff McAbee

Plaintiff McAbee was stopped by the surveillance officers shortly before 10:00 p.m. on April 27, 1995, while walking from 7211 to his mother's nearby home. He was transported to the CID Station and questioned about Gilbert. McAbee was handcuffed to a wall for six or seven hours and repeatedly sought to use the bathroom. Eventually, he was permitted to use the bathroom, but he was returned to the interview room and again handcuffed to the wall. He was later taken to the District III Station, registered as a prisoner, and placed in a cell. McAbee was released from the CID Station at approximately 11:00 a.m. on April 28, 1995.

### (4) Plaintiffs Edward Jones, Dana Williams, Carlos Marshall, and Mayhew

At approximately 10:40 p.m. on April 27, 1995, the surveillance officers stopped a gold Toyota Camry departing 7211 carrying four men: Plaintiffs Edward Jones, Dana Williams, Carlos Marshall, and Mayhew. They were transported to the CID Station, taken to separate interview rooms, and handcuffed to walls. Edward Jones was questioned for several hours and advised that if he gave a statement, he would be permitted to leave. Upon providing a statement, however, he was not released. Two of the interviewing officers testified they could not release him until someone with more knowledge of the investigation had reviewed his statement for accuracy. At about 5:00 a.m. on April 28, 1995, Edward Jones was taken to the District III

Station, registered as a prisoner, and placed in a cell. He was released from the CID Station at 9:45 a.m. on the morning of April 28.

Plaintiff Dana Williams was repeatedly interviewed on the night of April 27, 1995. Williams was released at approximately 2:30 a.m. on April 28, 1995. Plaintiffs Carlos Marshall and Mayhew were stripped of their personal items before being placed in separate interview rooms. They were handcuffed to walls throughout the interview process, and they were denied access to the bathroom despite repeated requests. Mayhew agreed to assist the police by paging Gilbert; however, after doing so, he was returned to the interview room and again handcuffed to the wall. Officer John Piazza also interviewed Mayhew and reported the contents of the interview to either Swope or Ricker. At approximately 5:00 a.m. on April 28, 1995, Marshall and Mayhew were taken to the District III Station, registered as prisoners, and placed in cells. They were released shortly before 6:00 a.m. on April 28, 1995.

### (5) Plaintiffs Mobley and Hamlet

Between 10:45 and 11:15 p.m. on April 27, 1995, the surveillance officers at 7211 stopped a red Chevrolet occupied by Plaintiffs Mobley and Hamlet. They were transported to the CID Station and placed in separate interview rooms; Mobley was handcuffed to a wall. Either Sergeant Swope or another Homicide Unit sergeant directed an officer to interview Mobley, who was also interviewed by other officers during the night. Mobley initially refused to answer questions, asserting that he was under no obligation to do so. Officers then threatened him with incarceration if he refused to respond, and he relented. Hamlet was interviewed and then locked in an interview room. At approximately 5:00 a.m. on April 28, 1995, Mobley and Hamlet were taken to the District III Station, registered as prisoners, and locked in cells. They were released sometime on the morning of April 28, 1995.

### 4. *The Second Search*

At approximately 4:30 a.m. on April 28, 1995, the County Police executed the search warrant for 7211. The residence was then occupied by Plaintiffs Eloise Jones, Vance, John Williams, Tamara Marshall, and Shanequia Marshall, as well as two non-plaintiffs (Carlton

Marshall and Plaintiff Hamlet's baby). After searching the premises of 7211, the officer-in-charge, Sergeant Howard Shook, had the occupants transported to the CID Station.

Plaintiff Tamara Marshall was thereafter locked in an interview room with her two children, and she was interviewed by several officers. She was advised that she would not be released until she signed a statement; however, upon signing a statement, she was not released. She and her two children were allowed to leave the CID Station sometime on the morning of April 28, 1995.

Plaintiff Vance was also locked in an interview room and handcuffed to a wall, and he was later interviewed by Corporal Robert Sheehan. At about 11:00 a.m. on April 28, 1995, Vance was informed of an outstanding warrant for his arrest due to a parole violation; he therefore remained in custody.[15]

### B.

The trial in this case was conducted on the Plaintiffs' claims of police misconduct during the First Search, the Detentions, and the Second Search. Prior to trial the Plaintiffs voluntarily dismissed their claims against the law officers who had detained, transported, and interviewed them. The Plaintiffs instead chose to pursue only their claims against the law officers who conducted the First Search, the primary investigators, certain officers who had incarcerated several plaintiffs in the District III Station cells, and supervisory officials of CID. During trial, the court directed verdicts in favor of most of the defendants. As such, the jury considered in substance the following questions:

---

[15]Plaintiff John Williams did not testify at trial, and the record does not reflect what happened to him. The jury did not find in his favor, and he has not appealed that aspect of the judgment. Plaintiff Eloise Jones was interviewed in the conference area of the CID Station, and she was not taken to an interview room. As with John Williams, the jury made no award to her. Thus, John Williams and Eloise Jones are not among the twelve Appellees.

1) *The First Search*: Whether Corporals Oldfield, Rosser, and Silvers violated the constitutional rights of Plaintiffs Edward Jones, Dana Williams, Randall, McAbee, Vance, and John Williams;

2) *The Detentions*: Whether the Supervisors violated the constitutional rights of Plaintiffs Randall, Edward Jones, Dana Williams, Mayhew, Carlos Marshall, Hamlet, Mobley, McAbee, and Swint; and

3) *The Second Search*: Whether the Supervisors and Sergeant Shook violated the constitutional rights of Plaintiffs Eloise Jones, Tamara Marshall, Shanequia Marshall, Vance, and John Williams.

In connection with its deliberations, the jury answered special interrogatories addressing the various issues and theories in the case. In summary, the verdict made the following findings:

1) *The First Search*: The jury found that the Corporals had seized Plaintiff Randall in violation of his federal and state constitutional rights. The jury also found, however, that the Corporals were entitled to qualified immunity with respect to the federal constitutional violation.[16] The jury awarded Randall $10,000 in compensatory damages against Rosser, Silvers, and the County, jointly and severally.

2) *The Detentions and the Second Search*: The jury found that the Supervisors were liable to all Plaintiffs except Eloise Jones and John Williams. Although the jury found in favor of the Supervisors on the theory of direct liability, it

---

[16]Qualified immunity does not protect the Corporals from liability for violations of Article 24. Therefore, they are liable under Maryland law even though they are immune under federal law. *See DiPino v. Davis*, 729 A.2d 354, 371 (Md. 1999) ("Unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local governmental entity has available any governmental immunity in any action based on rights protected by the State Constitution.").

found that Swope and Ricker were liable on a theory of bystander liability and that McQuillan was liable on a theory of supervisory liability.[17]

3) *The Damages*: The jury awarded the twelve recovering plaintiffs between $5,000 and $45,000 each in compensatory damages, jointly and severally against the Supervisors and the County.[18] It also awarded punitive damages against the Supervisors, and in favor of the nine plaintiffs involved in the Detentions. Each of the nine plaintiffs received punitive damages in the sum of $10,500, with Ricker being assessed $2,500 per plaintiff, Swope $3,500 per plaintiff, and McQuillan $4,500 per plaintiff.

Both the Appellants and the Plaintiffs filed post-trial motions. In their motions, the Appellants challenged their liability and the various damage awards. The Plaintiffs, on the other hand, contested the verdict in favor of the Corporals with respect to five plaintiffs, and they challenged the directed verdict awarded to Corporals William Evartt and Joseph Hoffman.[19] By its Opinion of February 6, 2001, the district court denied the post-trial motions, upheld the verdict in all respects, and awarded the Plaintiffs their attorneys' fees and costs.

---

[17]In response to Interrogatory 6, the jury found that the Supervisors did not knowingly order the Plaintiffs "be brought to CID without consent." In response to Interrogatory 7, the jury found that Swope and Ricker "knowingly violated [each] Plaintiff's Fourth Amendment right [and Article 24 of the Maryland Declaration of Rights protection] against unreasonable seizure and unlawful detention by failing to intervene with [his or her] detention." In response to Interrogatory 8, it found that McQuillan knew that his subordinates were engaged in conduct that posed a pervasive risk of constitutional violations, and that he was deliberately indifferent to that risk.

[18]Plaintiff Vance received compensatory damages of $5,000; Plaintiffs McAbee, Dana Williams, and Tamara Marshall received $10,000 each; Plaintiff Swint received $15,000; Plaintiffs Randall, Edward Jones, Mayhew, Carlos Marshall, Hamlet, and Mobley received $20,000 each; and Plaintiff Shanequia Marshall received $45,000.

[19]Corporals Evartt and Hoffman transported six plaintiffs from the CID Station to the District III Station, where they placed them in cells.

*Randall v. Prince George's County*, Opinion, Civ. No. AW-96-2296 (D. Md. Feb. 6, 2001) (the "Opinion").

Both the Appellants and the Plaintiffs have appealed the judgment of the district court. In connection with the direct appeal, we are presented with five issues:

> First, Sergeant Swope and Corporal Ricker challenge the court's imposition of liability on a theory of bystander liability. They assert in the alternative that the district court's jury instruction on bystander liability was erroneous;

> Second, Lieutenant McQuillan contends that the court improperly imposed § 1983 liability on a theory of supervisory liability. McQuillan maintains in the alternative that the jury instruction on supervisory liability was erroneous;

> Third, the Appellants maintain that, if they are liable for violating the Appellees' constitutional rights, an award of nominal damages is the only appropriate relief;

> Fourth, the Supervisors maintain that the evidence is insufficient to support an award of punitive damages; and

> Fifth, the Appellants contend that the damage awards are excessive.

The Plaintiffs raise three issues by way of their cross-appeal.[20] First, they challenge the summary judgment awarded to Prince George's County on their *Monell* claims; second, they assert that the court erred in granting the directed verdict to Evartt and Hoffman; and third, they maintain that the court erroneously calculated the attorneys' fee award of $195,000.

We possess jurisdiction over these appeals pursuant to 28 U.S.C. § 1291.

---

[20]The Appellees are joined on cross-appeal by Eloise Jones and John Williams, the two plaintiffs who were not awarded damages by the jury.

### III.

We review de novo the denial of a directed verdict, or the denial of judgment notwithstanding the verdict. *Price v. City of Charlotte, North Carolina*, 93 F.3d 1241, 1245 (4th Cir. 1996). We will not, however, disturb a jury verdict "unless, without weighing the evidence or assessing witness credibility, we conclude that reasonable people could have returned a verdict" only for the moving party. *Cooper v. Dyke*, 814 F.2d 941, 944 (4th Cir. 1987). In reviewing a jury verdict, we view the evidence, and all reasonable inferences therefrom, in the light most favorable to the prevailing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

We review de novo an award of summary judgment. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). In so doing, we stand in the same position as the district court, and we will uphold an award of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In reviewing an award of compensatory or punitive damages, we affirm the award unless it is against the clear weight of the evidence, based upon evidence that is false, or would result in a miscarriage of justice. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998). We review an award of § 1988 attorneys' fees for abuse of discretion. *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998).

### IV.

The issues before us fall into four basic categories: two relating to the contentions of the Appellants and two others relating to the contentions of the Plaintiffs. First, the Supervisors challenge the jury verdict that they are liable for the deprivations suffered by the Appellees on April 27-28, 1995. In that regard, they maintain that the evidence is insufficient to warrant the verdict on any theory of indirect liability. Second, the Appellants challenge the damage awards against them, contending that they are excessive.

The Plaintiffs, on the other hand, maintain that the award of summary judgment to Prince George's County on the *Monell* claims was improper. They contend that they produced sufficient evidence of a custom and usage by the County Police, in detaining witnesses against their will and without probable cause, to create a genuine issue of material fact. Second, the Plaintiffs assert that the award of attorneys' fees was erroneously calculated, contending that the court failed to account for work performed on claims that were unsuccessful. We address each of these issues in turn.

A.

1.

The Supervisors have appealed the findings of liability against them under § 1983 and Article 24.[21] Two of the Supervisors, Sergeant Swope and Corporal Ricker, maintain that the evidence is insufficient to sustain the verdict against them on the theory of bystander liability. Similarly, Lieutenant McQuillan maintains that there was insufficient evidence to sustain the verdict against him on the theory of supervisory liability. As explained below, these contentions have merit.

2.

Under § 1983, a state actor may be liable if he "subjects, or causes to be subjected" an individual "to the deprivation of any rights, privileges, or immunities secured by the Constitution." As a general matter, a law officer may incur § 1983 liability only through affirmative misconduct. *See generally Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). In this case, however, the jury found that the Supervisors had not engaged in any affirmative conduct that deprived the Appellees of their federally protected rights. It instead based its verdict

---

[21]The Corporals (Rosser and Silvers) do not appeal on any issues of liability, but appeal only on the excessive nature of the damage awards against them. *See infra* Part IV.B.

against them on two theories of indirect liability: "bystander liability" as to Swope and Ricker, and "supervisory liability" as to McQuillan.[22]

Although personal liability premised on an omission is a disfavored concept, it is well-established that an omission to act, when coupled with a duty to act, may provide a basis for liability. The concepts of bystander and supervisory liability are each premised on omissions, but there are significant differences between them. The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them. *See infra* Part IV.A.3.a. Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (observing that officer who stands by and does not seek to assist victim could be "tacit collaborator").

On the other hand, the theory of supervisory liability arises from the obligation of a supervisory law officer to insure that his subordinates act within the law. *See infra* Part IV.A.4.a. Although such a supervisor may not prevent all illegal acts by his subordinates, he is obligated, when on notice of a subordinate's tendency to act outside the law, to take steps to prevent such activity. If a supervisory law officer is deliberately indifferent to that responsibility, he then bears some culpability for illegal conduct by his subordinates, and he may be held vicariously liable for their illegal acts. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Thus, although the separate concepts of bystander and supervisory liability arise from a failure to act in the presence of a duty, they are based on differing duties and obligations, and our analysis of them is separate and distinct. With this overview in mind, we now turn to the Supervisors' specific challenges to the verdict.

---

[22]The jury made findings on all three theories, i.e., direct, bystander, and supervisory liability, as to each of the Supervisors. The jury found Swope and Ricker not liable under theories of direct and supervisory liability, but liable under bystander liability. It found McQuillan not liable under theories of direct and bystander liability, but liable under supervisory liability.

3.

Sergeant Swope and Corporal Ricker maintain that the court erred in submitting the theory of bystander liability to the jury, contending that the evidence against them is insufficient. In addressing this contention, we recognize that our Court has not definitively assessed the circumstances under which bystander liability might attach to a law officer, although we have indicated that such circumstances may exist. *See Jackson v. Pantazes*, 810 F.2d 426, 430 (4th Cir. 1987) (observing that liability might be found when officer failed to intervene to stop state actor from performing unconstitutional search). As such, we must first address whether, and under what circumstances, officers may be subjected to bystander liability under § 1983.

a.

Several of our sister circuits have adopted a framework for assessing the applicability of bystander liability for law officers. *See Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Bruner v. Dunaway*, 684 F.2d 422, 425-26 (6th Cir. 1982); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). As a general proposition, these courts have concluded that an officer possesses "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Anderson*, 17 F.3d at 557. According to the Second Circuit, such a duty attaches when an officer observes or has reason to know that a "constitutional violation [is being] committed" by other officers and possesses "a realistic opportunity to intervene to prevent the harm from occurring." *Id.*; *see also Yang*, 37 F.3d at 285.

This standard recognizes that, in certain limited situations, bystanding officers are obliged to act.[23] As the Seventh Circuit cogently

---

[23]Swope and Ricker assert that the concept of bystander liability is only applicable in excessive force cases, and that it has no applicability here because there were no allegations of excessive force. Although

observed in *Byrd v. Brishke*, "it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." 466 F.2d at 11. Any rule to the contrary would permit officers to ignore their duty to enforce the law. Therefore, an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights[24]; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.

b.

With this test for bystander liability in mind, we turn to the contention of Swope and Ricker that the evidence does not support the verdict against them. Applying the three-part test enunciated here, we must assess whether the evidence is sufficient to show that either Swope or Ricker knew the Appellees were being unlawfully detained on April 27-28, 1995, and that, having such knowledge, either of them failed to exercise a realistic opportunity to intervene and end the unlawful detentions.

It is clear that Swope and Ricker, if they were aware that the Appellees were being detained unlawfully, had an opportunity to end

bystander liability decisions have usually involved excessive force claims, use of the bystander liability theory has not been so limited. *See Yang*, 37 F.3d at 285 (concluding that bystander liability applicable to cases of unjustifiable arrest and other constitutional violations); *Anderson*, 17 F.3d at 557 (same).

[24]Although some of our sister Circuits have employed slightly different formulations of the knowledge prong, this requirement has substantively been the same: namely, that a bystanding officer must know of his fellow officer's misconduct. The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.

the detentions, and they did not do so. Thus, the relevant question is whether the evidence warrants a finding that Swope and Ricker knew the Appellees were being unlawfully detained. In assessing that issue, the knowledge of Swope and Ricker must be evaluated separately with respect to each of the Appellees. In order for the verdict to be sustained, the evidence must show that they knew three things: (1) that a particular Appellee was present at the CID Station on April 27-28, 1995; (2) that there was an absence of probable cause to detain that Appellee; and (3) that such Appellee was being held against his or her will. Viewed in the light most favorable to the Appellees, the evidence on these points is as follows:

- Swope and Ricker knew that there was probable cause to arrest only Jeffrey Gilbert;

- Various Appellees had been brought to the CID for interviews;

- The routine procedure in a major investigation was that the lead investigator or his superior (i.e., Swope or Ricker) reviewed witness statements at some point;

- The routine procedure was that witnesses were not released until the lead investigator or his supervisor were satisfied that the interviews were complete and gave approval;

- Some of the Appellees screamed, banged on doors, and yelled about being detained in interview rooms;

- The Appellees were moved about the CID Station in handcuffs during the night;

- Swope and Ricker were in the central area of the CID Station for most the night of April 27-28, 1995, and they might have heard the Appellees; and

- Swope and Ricker might have seen the Appellees being transported in handcuffs.

This evidence, however, fails to demonstrate a bystander liability case against Swope or Ricker. Significantly, the CID was conducting multiple investigations on the night of April 27-28, 1995, and there were many interviewees present at the CID Station that evening who were entirely unconnected to the Novabilski investigation. Although the evidence demonstrates that Swope and Ricker knew that (1) some of the Appellees were present at the CID Station, and that (2) individuals were being detained there against their will, it fails to show that Swope and Ricker also knew that these two groups (i.e., the Appellees and the persons being involuntarily detained) were one and the same. And with the substantial number of persons present at the CID Station that evening, such a connection cannot be satisfied through mere inference.

In the final analysis, the viability of the bystander liability verdict turns on what Swope and Ricker knew about each of the Appellees. When examined in that light, there is no evidence that either of them knew that Plaintiffs Edward Jones, Dana Williams, Carlos Marshall, Hamlet, McAbee, Tamara Marshall, and Vance were present at the CID Station, or that they, collectively or individually, were being detained against their will. Although either Swope or Ricker knew that Plaintiffs Mayhew, Mobley, and Swint were present at the CID Station, and also knew that there was no probable cause for any of them to be detained, there is no evidence that either Swope or Ricker knew that any of them was being held involuntarily. Finally, there is no evidence that either Swope or Ricker knew that Plaintiff Shanequia Marshall was present at the CID Station that evening.

The evidence as to Plaintiff Randall presents a more difficult question. Officer Rositch testified at trial that he gave Randall's statement to Swope and that Swope reviewed its contents. Coupled with the evidence summarized above, there is sufficient evidence for a jury to conclude that Swope knew that there was no probable cause to hold Randall and that Randall had not been released. There is no evidence, however, that Swope knew that Randall was being detained against his will. As far as Swope knew, Randall could have been at the CID Station voluntarily. Thus, there is no basis on which the jury could reasonably conclude that Swope knew Randall was involuntarily present in the CID Station. Moreover, there is no evidence that Ricker knew anything about Randall's presence at the CID Station. As such,

the evidence is insufficient to support the bystander liability verdict against Swope and Ricker as to any of the Appellees.[25]

4.

Lieutenant McQuillan also challenges the verdict against him, which is based on supervisory liability. McQuillan maintains that, as a matter of law, supervisory liability cannot attach in the absence of prior constitutional abuses by subordinates. He contends that the evidence fails to show any such abuses.

a.

As we enunciated in *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), supervisory liability may attach under § 1983 if a plaintiff can establish three elements. These are: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) "that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* at 799 (citations omitted). Under the first prong of *Shaw*, the conduct engaged in by the supervisor's subordinates must be "pervasive," meaning that the "conduct is widespread, or at least has been used on several different occasions." *Id.* Furthermore, in establishing "deliberate indifference" under *Shaw*'s second prong, a plaintiff "[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). Deliberate indifference, however, may be satisfied by showing "[a] supervisor's continued inaction in the face of documented widespread abuses." *Id.*

---

[25]Because there is insufficient evidence to sustain the verdict on the bystander liability theory, we need not resolve Swope and Ricker's assertion that they are entitled to qualified immunity.

b.

Lieutenant McQuillan contends that the Appellees did not present any evidence of prior misconduct by officers under his supervision, and that the first two elements of the Appellees' supervisory liability claims therefore fail as a matter of law. In response, the Appellees concede that they did not present any evidence of misconduct by McQuillan's subordinates prior to April 27-28, 1995. Instead, they contend that they have satisfied the requirements of supervisory liability through two other avenues. First, they assert that it is the customary practice of the County Police to hold witnesses until the lead investigator or his supervisor authorized their release, and that this custom satisfies the "widespread and pervasive" and "deliberate indifference" requirements mandated by *Shaw*. In the alternative, the Appellees maintain that they proved that multiple unconstitutional acts occurred on the night of April 27-28, 1995, and that the presence of so much unlawful activity in that short time frame satisfies the requirements of *Shaw*.

The Appellees' contentions have no merit. First, although evidence that the County Police had a custom of unconstitutionally detaining witnesses might be sufficient to demonstrate prior abuses, *see Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999), no such evidence was presented in this case. Certain officers did acknowledge a standard practice not to release a witness until the lead investigator or his superior reviewed the witness's statement, but such a practice is not unconstitutional. In fact, this commonsensical policy is employed in nearly every police department across the country. To demonstrate that members of the County Police engaged in conduct that poses a "pervasive and unreasonable" risk of constitutional injury, the Appellees should show that it was customary to detain witnesses even if they expressed a desire to leave. There was no evidence, however, that it was customary for the County Police to detain witnesses against their will in the absence of probable cause. As such, the Appellees' evidence on the customary practices of the County Police fails to satisfy the requirements of *Shaw*.

The Appellees' second contention, that the "widespread and pervasive" requirement of *Shaw* is satisfied by the sheer volume of activity on April 27-28, 1995, fails as well. In essence, they suggest that a lit-

any of constitutional violations, occurring roughly simultaneously, implies that McQuillan must have known about such activity, or that he was willfully ignorant. This contention, however, contradicts the premise of supervisory liability, i.e., that the failure to supervise contributed to the constitutional deprivation in question. *Slakan*, 737 F.2d at 372 ("Liability in this context is not premised on *respondeat superior* . . . but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict . . . ."). Because supervisors "cannot be expected to promulgate rules and procedures covering every conceivable occurrence," and because they may be powerless to prevent deliberate unlawful acts by subordinates, the courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach. *Id.* at 373.

The Appellees' contentions, however, do not relate to McQuillan's duty to supervise. They presented no evidence that McQuillan knew about any propensity for unlawful action by his subordinates, and they provided no evidence that he had an opportunity to prevent recurrences. Their position is that McQuillan had to know that his fellow officers were committing constitutional violations and yet he chose to do nothing; in essence, that McQuillan should be liable on a theory of bystander liability. However, the jury found that he was not liable as a bystander. Because the evidence is insufficient to sustain the verdict against Lieutenant McQuillan on the theory of supervisory liability, we must vacate it.[26]

## B.

Having resolved the issues relating to the liability of the Supervisors, we turn to the sole remaining damage award, which was made to Plaintiff Randall in connection with the First Search.[27] It is well

---

[26]The Supervisors also appeal the jury instructions given for bystander and supervisory liability. Because they are not liable under either theory, we need not address those challenges.

[27]The Supervisors also challenge the punitive damages award made against them. They assert that, pursuant to the Supreme Court's decisions in *Smith v. Wade*, 461 U.S. 30 (1983), and *Kolstad v. American Dental*

established at common law that a plaintiff can only recover damages for actual injury suffered as a result of the alleged tort. *See Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Randall was therefore required to show an actual injury resulting from his unlawful seizure. The Corporals (Rosser and Silvers) maintain that Randall failed to make such a showing, because he offered no evidence of physical or monetary injury and he presented insufficient evidence of emotional distress.

1.

Because the Corporals, pursuant to the verdict, possess qualified immunity for any violation of Randall's federally protected constitutional rights, their liability to Randall stems solely from their violation of his constitutional rights under Article 24. As such, our examination of their challenge to Randall's damage award is governed by Maryland law. This distinction has theoretical significance because, although the right of recovery for federal violations arises under statute, i.e., § 1983, "a violation of Article 24 of the Maryland Declaration of Rights may be redressed through a common law action for damages." *Ashton v. Brown*, 660 A.2d 447, 462 (Md. 1995); *see DiPino v. Davis*, 729 A.2d 354, 371 (Md. 1999). As a practical matter, however, this distinction makes little difference because § 1983 creates "a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Carey v. Piphus*, 435 U.S. 247, 253 (1978). As such, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Stachura*, 477 U.S. at 306. Our analysis of whether Randall suffered an actual injury warranting

---

*Association*, 527 U.S. 526 (1999), the Appellees were required to show that they had been "recklessly indifferent" to the Appellees' federally-protected rights, and that no such showing was made. Because the Supervisors are not liable for any constitutional deprivations, the punitive damages awards against them are vacated, and we need not reach this contention.

compensatory damages therefore appears to be the same under both § 1983 and Article 24 jurisprudence.[28]

a.

At common law, tort damages were "designed to provide '*compensation* for the injury caused to plaintiff by defendant's breach of duty.'" *Id.* (quoting 2 F. Harper et al., Law of Torts § 25.1, 490 (2d ed. 1986)). Therefore, in order to justify an award of compensatory damages under Article 24, a plaintiff must show an actual injury resulting from a constitutional deprivation. *Id.* at 308-09; *Carey*, 435 U.S. at 264. And it is settled that, in the absence of an actual injury, such a deprivation will justify only nominal damages. *Carey*, 435 U.S. at 266.

The concept of actual injury at common law is a broad one, and the Supreme Court has recognized that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . ., personal humiliation, and mental anguish and suffering." *Stachura*, 477 U.S. at 307. Actual injury therefore may include emotional distress. *Carey*, 435 U.S. at 264. We have recognized, in the § 1983 context, that a "plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress based on a constitutional violation." *Price v. City of Charlotte, North Carolina*, 93 F.3d 1241, 1254 (4th Cir. 1996). Such evidence must, however, "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages." *Id.* With these legal principles in mind, we turn to the contentions of the Corporals that Randall suffered no "actual injury."

---

[28]In fact, Maryland courts have identified only three differences in the availability of damages between an action under Article 24 and one under § 1983: (1) officials do not possess qualified immunity for state constitutional violations; (2) under Article 24, no distinction is drawn between official capacity and individual capacity; and (3) local government entities have respondeat superior liability for state constitutional violations. *DiPino*, 729 A.2d at 371-72.

b.

The Corporals assert that Plaintiff Randall suffered neither monetary nor physical injury, and that his only possible injury was emotional distress. They further maintain that, because Randall was not distraught over his detention, the evidence of emotional distress was insufficient to satisfy the principles enunciated in *Price*. As such, the Corporals contend that Randall failed to show an actual injury and that the nominal sum of one dollar is the appropriate award.

As we have previously observed, actions under Article 24 are common law actions and therefore governed by common law tort principles. Randall's claim is that he was unconstitutionally seized and detained against his will, in essence that he suffered the common law tort of false imprisonment.[29] In an action for false imprisonment at common law, a plaintiff may claim "compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health." W. Keeton et al., Prosser and Keeton on The Law of Torts 48 (5th ed. 1984); *see Beckwith v. Bean*, 98 U.S. 266, 276 (1878) (recognizing loss of time as potential element of compensatory damages in false imprisonment action); *Samuel v. Rose's Stores, Inc.*, 907 F.Supp. 159, 164 (E.D. Va. 1995) (same). As such, a jury may compensate a plaintiff in an Article 24 action premised on an unconstitutional seizure and detention for the time he lost and the physical discomfort he experienced as a result of the unconstitutional activity.[30] *See Wright v. Sheppard*, 919 F.2d 665, 669 (11th

---

[29]Merely because a plaintiff has suffered the common law tort of false imprisonment does not, of course, imply that he has also suffered a deprivation of his state constitutional rights. *See generally Baker v. McCollan*, 443 U.S. 137, 146 (1979). In this case, however, the Corporals concede that Randall's seizure and detention were unconstitutional, and that they can form the basis of his Article 24 claim.

[30]An award of compensatory damages for loss of time requires, of course, something more than a brief detention. We have observed in the § 1983 context that being seized for a minimal amount of time does not constitute an actual injury warranting compensatory damages. *Norwood v. Bain*, 166 F.3d 243, 245 (4th Cir. 1999) (en banc) (concluding that plaintiffs who were unconstitutionally searched and seized for brief period of time suffered no loss and were only entitled to nominal damages).

Cir. 1990) (concluding that common law damages principles govern damages for § 1983 false imprisonment claim); *cf. Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (indicating compensatory damages available for physical discomfort and loss of time in § 1983 action analogous to malicious prosecution).

In this case, the jury was entitled to conclude that Randall suffered an actual injury on April 26, 1995, and that such injury resulted from unconstitutional activity. On that occasion, he was rousted naked from a bathtub at gunpoint and forced to kneel outside 7211 for approximately sixty minutes in his boxer shorts while being questioned. Thus, viewed in the light most favorable to Randall, he offered ample evidence of time lost and discomfort experienced as a result of an unconstitutional detention.[31] His award of compensatory damages therefore was warranted.[32]

## V.

## A.

Turning to the cross-appeal, the Plaintiffs contend that the court erred in awarding summary judgment to Prince George's County on

---

[31]As to whether Randall suffered emotional distress, we note that his testimony provides some "demonstrable evidence" of emotional distress, albeit not much. For example, Randall did state that he had difficulty sleeping in the wake of the First Search. We need not determine whether such a showing is sufficient because of Randall's other evidence of actual injury.

[32]The Appellants also contend that the court erred in denying their motion for a remittitur, asserting that the compensatory and punitive damage awards were excessive. Because we vacate all the damage awards made against the Supervisors, we examine the remittitur issue only as to the $10,000 award made to Randall. In that regard, we will set aside an award of compensatory damages as excessive only if "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice . . . or no substantial evidence is presented to support it." *Hetzel v. County of Prince William*, 89 F.3d 169, 171 (4th Cir. 1996) (internal quotation marks omitted). In the circumstances here, the denial of a remittitur on Randall's award was not erroneous.

their *Monell* claims, i.e., their contention that the County maintained an unofficial policy of detaining persons against their will in the absence of probable cause. They assert that the evidence concerning a police custom in Prince George's County of holding witnesses until the lead investigator approves their release created a genuine issue of fact on whether the County was deliberately indifferent to an unofficial policy of unconstitutional detention.

We have recognized that, in appropriate circumstances, § 1983 liability may attach to a municipality for the misconduct of its police force. *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). If a police force develops an unconstitutional "custom or usage," i.e., a widespread practice of a particular unconstitutional method, such custom or usage may be the basis for municipal liability, "but only if its continued existence can be laid to the fault of municipal policymakers, and a sufficient causal connection between the 'municipal custom and usage' and the specific violation can then be established." *Id.* In order for liability to attach, (1) the municipality must have "actual or constructive knowledge" of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, "as a matter of specific intent or deliberate indifference," to correct or terminate the improper custom and usage. *Id.* at 1391.

Under *Spell*, constructive knowledge of such a custom and usage "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." *Id.* Moreover, a sufficient causal connection between "such a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Id.* As Judge Phillips observed in *Spell*, the "failure to correct the known practices must be such as to make the specific violation 'almost bound to happen, sooner or later.'" *Id.*

In this case, the only evidence concerning custom and usage was the testimony of certain officers that they were not normally permitted to release witnesses until so authorized by the lead investigator or his supervisor. There was no evidence, however, that the County Police

routinely detained witnesses against their will until the lead investigator authorized their release; rather, the procedure centered on the idea of checking with the lead investigator before concluding a witness interview. Put simply, there was no evidence that the County Police continually held witnesses who expressed a desire to leave. As such, the evidence, viewed in the light most favorable to the Plaintiffs, is insufficient to support a finding that the County Police maintained a custom and usage of unconstitutional detention. Thus, the court's award of summary judgment to the County on the *Monell* claims was appropriate.

## B.

The Plaintiffs have also cross-appealed on the $195,000 award for their attorneys' fees and costs. In its calculation of this award, the court reduced the claim because of the Plaintiffs' relative success rate. Opinion at 6-9. In so doing, it observed that the case began with twenty-seven defendants, fifteen plaintiffs, and fifty-five counts; went to the jury with seven defendants, fourteen plaintiffs, and five counts; and resulted in a favorable verdict against five defendants for twelve plaintiffs. Opinion at 8. In its calculations, the court deducted the time spent by counsel on the claims of the two plaintiffs who did not prevail, and it also deducted the time spent in preparing the unsuccessful case against Officers Oldfield and Shook. It then deducted the time spent preparing the case against the Corporals, because they were only found liable on the pendent state constitutional claims.[33] Finally, the court reduced the remaining number of hours by one-third to account for the number of defendants found liable on the federal claims relative to the number of defendants originally named.

Pursuant to 42 U.S.C. § 1988, a court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." And we review such an award for an abuse of discretion. *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998). A court, how-

---

[33]As our Judge Field observed in *Haywood v. Ball*, 634 F.2d 740, 743 (4th Cir. 1980), an award of attorneys' fees pursuant to § 1988 is not required or justified "in a case where the plaintiff has lost on the constitutional issue after a plenary trial" but has recovered on pendent state law claims.

ever, abuses its discretion if it makes a mistake of law. *Id.* The Plaintiffs maintain that the court made such a mistake by deducting from their claim on the basis of their success rate. They contend that, under *Brodziak*, a court must focus on whether the successful and unsuccessful claims are related to one another, and that it should not focus solely on the success rate. The Plaintiffs observe that their claims arose from the same set of operative facts, and they maintain that the court thereby erred in penalizing them for their success rate.

In this contention, the Plaintiffs misapprehend our decision in *Brodziak*. That decision in no way undermined the Court's mandate in *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983), that the "most critical factor" in calculating a reasonable fee award "is the degree of success obtained." In *Brodziak*, we merely reiterated *Hensley*'s holding that a court may not use "a purely mathematical comparison between the number of claims pressed and the number prevailed upon" to calculate a fee award. *Brodziak*, 145 F.3d at 197. In this situation, the court did not utilize a purely mathematical formula in calculating its fee award; in fact, it made the following pertinent observation:

> The Court will not punish the Plaintiffs for filing their claims against a number of Defendants. This was a difficult action to determine which officers might have acted in a potentially unconstitutional manner. Plaintiffs must make sure that every officer was included who could have violated their rights or risk losing the ability to go to trial because of the statute of limitations.

Opinion at 8-9. Thus, the court's calculation of the fee award was not an abuse of discretion. Nevertheless, because we vacate nearly all of the damage awards, and because no plaintiff has prevailed on a federal constitutional claim, we will remand for a recalculation of the attorneys' fee award.[34]

---

[34]The Plaintiffs also maintain that the court erred in granting qualified immunity to defendants Evartt and Hoffman. We have previously recognized that an officer does not lose qualified immunity when he violates an individual's federal rights "unless a reasonable officer would know

## VI.

For the foregoing reasons, we vacate the damage awards against the three Supervisors; we affirm the award of compensatory damages to Randall against the Corporals; we affirm the award of summary judgment to Prince George's County on the *Monell* claims; we affirm the award of qualified immunity to Evartt and Hoffman; and we remand for further proceedings on the attorneys' fee award.

*AFFIRMED IN PART, VACATED*

*IN PART, AND REMANDED*

MICHAEL, Circuit Judge, concurring:

I concur in the court's opinion. I write separately only to explain more fully why I agree with the decision in part IV(A)(3)(b) to overturn the jury verdicts against Sergeant Swope and Corporal Ricker.

The jury held Swope and Ricker liable for the detentions on April 27-28, 1995, on a theory of bystander liability. With one minor exception, I agree with the court's statement of the relevant legal principles that apply to this theory.[1] I also agree that Swope's and Ricker's lia-

---

that the specific conduct at issue was impermissible." *Rogers v. Pendleton*, 249 F.3d 279, 285 (4th Cir. 2001). Even viewing the evidence in the light most favorable to the Plaintiffs, Evartt and Hoffman simply walked six of the plaintiffs to the processing center to be placed in cells. Under the circumstances, there is insufficient evidence to suggest that a reasonable officer would have known that such conduct was impermissible. As such, the ruling in favor of Evartt and Hoffman cannot be disturbed.

[1]The court's opinion says that Swope and Ricker could be liable to an individual plaintiff on a bystander liability theory only if they knew that the individual plaintiff was present at the CID (Criminal Investigations Division) station. *Ante* at 24. This standard is a bit too strict. The plaintiffs argued, and the jury apparently believed, that various friends and relatives of murder suspect Jeffrey Gilbert were systematically rounded up and detained involuntarily at the CID station without probable cause. If there was sufficient evidence to support a conclusion that Swope and Ricker knew that a roundup was under way and failed to intervene, I would hold them liable to all the victims of the roundup regardless of whether the two officers knew that each individual victim was present.

bility turns on whether the evidence supports the jury's finding that the two officers knew the plaintiffs were being detained involuntarily. Although I ultimately agree with the conclusion that the evidence was insufficient to support this finding, I want to emphasize that this is still a disturbing case.

It is important to remember that, as tried to the jury, this case was not primarily about whether Swope or Ricker knew that particular plaintiffs were being held against their will and without probable cause. Instead, the parties devoted most of their attention to the more basic question of whether the plaintiffs were involuntarily detained. The defendants' theory at trial was that the various plaintiffs came to the CID (Criminal Investigations Division) station and remained there voluntarily. In contrast, the plaintiffs argued that Prince George's County police officers rounded them up and detained them against their will without even a semblance of probable cause. The jury resolved this issue in the plaintiffs' favor, and the evidence was easily sufficient to support that conclusion. In other words, the jury justifiably concluded that Prince George's County police officers violated the plaintiffs' Fourth Amendment rights. Because the individual officers who rounded up the plaintiffs and questioned them had been dismissed from the case, the jury did not decide whether those officers were liable. I believe the evidence would have supported a finding of liability against those officers. But that is not the question before us. We are left to decide whether the jury could reasonably pin the responsibility for the unlawful detentions on Swope and Ricker.[2]

Given the jury's reasonable belief that the plaintiffs' Fourth Amendment rights were violated by county police officers, the jury had two basic choices. It could have thought either that the officers who illegally detained the plaintiffs were acting as part of a centralized plan directed by the leaders (including Swope and Ricker) of the

---

[2]If § 1983 imposed respondeat superior liability on municipalities, the county would be liable for the detentions because the officers responsible were acting under color of law and in the scope of their employment. *Cf. Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 430-37 (1997) (Breyer, J., dissenting) (suggesting that respondeat superior liability might be the appropriate standard for municipal liability under § 1983).

Novabilski murder investigation or that the officers were essentially rogue cops acting on their own initiative. Neither side argued the rogue cop theory to the jury, and the evidence seemed to point to a centralized plan. Many officers were involved in the roundup, and officers received radio transmissions from CID instructing them to bring in for questioning anyone seen leaving the house at 7211 East Forest Road. J.A. 422-23. There was thus sufficient evidence to support a finding that the officers who rounded up the plaintiffs were acting under orders from CID. Despite this, the jury found in a special interrogatory that Swope, Ricker, and Lieutenant McQuillan did *not* order that the plaintiffs be brought to CID involuntarily. J.A. 1106. It is fair to conclude from this finding, as the court's opinion apparently does, that the jury saw the officers who detained the plaintiffs as rogue cops who initially took the plaintiffs into custody with neither the blessing nor the knowledge of their superior officers. Once the case is seen in this light, Swope's and Ricker's liability must turn on the difficult question of whether they knew that the plaintiffs were being held involuntarily at CID.

As the court points out, there was no direct evidence that Swope and Ricker knew that the plaintiffs were being detained involuntarily. There was, however, some circumstantial evidence from which the jury apparently inferred that Swope and Ricker must have known about the roundup and simply failed to do anything about it. The court's opinion fairly summarizes the relevant evidence and concludes that the evidence cannot support the jury's inference that Ricker and Swope knew the plaintiffs were involuntarily detained. Though I find the question to be an exceptionally close one, I have to agree. As the opinion emphasizes, the evidence supports a finding that Swope and Ricker knew some of the plaintiffs were at the station and that some individuals were being held there against their will, but it "fails to show that Swope and Ricker also knew that these two groups (i.e., the Appellees and the persons being involuntarily detained) were one and the same." *Ante* at 25. Accordingly, I concur in the court's treatment of Swope's and Ricker's liability for the unlawful detentions on the night of April 27-28, 1995.

This is the legally correct result, but the decision in favor of Swope and Ricker should not be allowed to obscure the unsettling facts of this case. Regardless of whether liability could properly be imposed

on these officers, it remains true that the jury reasonably concluded that county police officers rounded up and involuntarily detained the plaintiffs in the knowing absence of probable cause. That conclusion ought to be troubling to officials in Prince George's County and to all who value the protections of the Fourth Amendment.